CONSTRUCTION AGGREGATE TRANS-
PORT, INC., a Florida corporation,
Plaintiff-Appellee,

v.

FLORIDA ROCK INDUSTRIES, INC., a
Florida corporation,
Defendant-Appellant,

Florida Crushed Stone, a Florida
corporation, Defendant.

No. 81–5693.

United States Court of Appeals,
Eleventh Circuit.

July 29, 1983.

Carlton, Fields, Ward, Emmanuel, Smith & Cutler, C. Timothy Corcoran, III, Tampa, Fla., William B. Sullivan, Washington, D.C., for defendant-appellant.

Schwartz & Wilson, Herbert T. Schwartz, Gainesville, Fla., for plaintiff-appellee.

Before VANCE and ANDERSON, Circuit Judges, and SCOTT *, District Judge.

R. LANIER ANDERSON, III, Circuit Judge:

Florida Rock Industries ("FRI") appeals from an adverse judgment entered against it in a treble damages action under § 4 of the Clayton Act, 15 U.S.C.A. § 15 (West Supp.1983),[1] and § 1 of the Sherman Act, 15 U.S.C.A. § 1 (West Supp.1983).[2] A jury found for the plaintiff, Construction Aggregate Transport, Inc. ("CAT"), and awarded damages of $300,000, which the trial court

---

* Honorable Charles R. Scott, U.S. District Judge for the Middle District of Florida, was a member of the panel that heard oral arguments but due to his death on May 12, 1983 did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

1. 15 U.S.C.A. § 15(a) (West Supp.1983) states in relevant part:

any person who shall be injured in his business or property by reason of anything for-

bidden in the antitrust laws may sue therefor in any district court of the United States. . . .

2. 15 U.S.C.A. § 1 (West Supp.1983) states in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

trebled. We reverse and remand for a new trial because the trial court erred in instructing the jury on a theory of per se illegality.[3]

## I. FACTS

Construction Aggregate Transport, Inc., a Florida corporation engaged in the hauling of sand, gravel, and other rock material ("aggregate") in Central and Southern Florida, was the brainchild of one, Al Hallowell, who had worked for many years in the trucking business in Florida. The idea upon which CAT was based was a novel one for the aggregate[4] hauling business in Florida, and involved the use of double trailers. By using these double trailers, which required only one tractor and one driver, rather than the single trailers which were the norm in the aggregate hauling industry, a substantial reduction in costs could be realized.

Hallowell also recognized that most truckers of bulk aggregate use one-way hauls; after delivering their shipment of bulk aggregate they return with an empty load to the aggregate supplier. Obviously, a business which relied on two-way hauling could maximize the use of its equipment and reduce the cost of transporting each trailer of aggregate.[5]

The Florida aggregate industry historically has been geographically divided into two separate markets. Each of these markets is supplied primarily by rock mined within the particular market. One market centers around Brooksville, near Orlando in Central Florida. Aggregate produced in the Brooksville-Orlando market generally constitutes the primary supply for asphalt producers in the Central Florida area. The defendant, Florida Rock Industries, is one of the largest producers of aggregate in the state of Florida, and is one of the primary suppliers in the Brooksville-Orlando market area.[6] The other geographical aggregate market in the state of Florida centers around the Miami and West Palm Beach area. Thus, the primary sources of aggregate materials used in the production of asphalt in Florida are the rock mines in the Miami market and the Brooksville-Orlando market. Finally, another important facet of the Brooksville-Orlando market is the production of sand materials, also used in the construction industry. Much of this sand is produced at Clermont, due east of Orlando.

At the time that Hallowell conceived the idea of using double trailers, a strong demand existed in the Miami market for the sand produced outside of Clermont in the Brooksville-Orlando market. See Record at 1066. Further, there was a strong demand in the Brooksville-Orlando market for the rock being produced by the Miami mines. According to testimony at trial, no existing hauling outfit had attempted to take advantage of the separation of these two markets. Hallowell therefore determined that the time was ripe for an aggregate trucking outfit which could meet the demand for sand in the Miami and West Palm Beach area and also introduce Miami rock into the Brooksville-Orlando area.

Miami and Orlando lie at opposite ends of a 200-mile north-south stretch of the Florida Turnpike. Hallowell's plan was to pick up sand in the Clermont area west of Orlando and truck it down to the West Palm Beach area alongside the Turnpike. After delivering the sand to his customers in West Palm Beach, he would then drive to the

---

**3.** As discussed in Section V(B) below, we also have serious reservations regarding CAT's proof of damages. *See infra* text accompanying note 55.

**4.** The term "aggregate" refers to sand, gravel, slag, crushed stone and like materials which are mixed with a cementing material to form concrete, cement, mortar, or asphalt. Such materials are key ingredients in the construction industry.

**5.** Such a one-way haul is known as a "deadhead over." Obviously, the "trucker's dream" is a full load on both hauls. Record at 1084–85.

**6.** According to its president, Edward Baker, FRI is the largest producer of aggregate in the state of Florida. Record at 1557.

stone mines in the Miami area, load his double trailers with aggregate material and return to the Orlando area, delivering the Miami aggregate to asphalt producers in and around Orlando. Under this plan, CAT's truckers would engage only in two-way hauls. Further efficiencies would be realized by using the double trailers, which could carry twice the normal load.[7]

In the summer of 1977, Hallowell began efforts to implement this plan. First, he persuaded a friend, Dr. Ward, to contribute capital needed for starting up the operation. Dr. Ward contributed $15,000 and, after Mr. Hallowell's own contribution, CAT was able to begin with operating capital of $35,000.[8]

Next Hallowell set about designing the necessary trailers and securing their manufacture. Of critical importance to our narrative is Hallowell's choice of trailer. Rather than selecting the rear dump trailers that were generally used in the bulk aggregate hauling business in Central Florida, Hallowell chose to design his trucking operation around the use of bottom dump or "hopper" trailers. A rear dump trailer is emptied of its contents by tilting the entire trailer unit on a horizontal axis, thus allowing the aggregate to slide out the back door. The result is a relatively concentrated pile of aggregate. Record at 1059. With the hopper trailer, material is emptied through the bottom of the trailer by means of gull-wing type doors. If the driver is careful when unloading, the result will be long, narrow, and neat "windrows" of aggregate material. Generally, regardless of the type of trailer used the purchaser of

the aggregate will have to use a "payloader" or "front end loader" to move the deposited material into larger stockpiles. It is possible, however, that this job may take longer and require greater effort when the material has been deposited in windrows by a hopper trailer.[9]

Hallowell next took his design to Walter Harkala of Hardey Manufacturing. Harkala agreed that there was merit to Hallowell's business plan, and after working out the financial details Hardey Manufacturing began to construct the necessary trailers. The manufacturing process proved to be a slow one. Because of the unique design features of the new trailers, in particular the mechanism for opening the gull-wing doors, production of the first set of trailers took approximately six months. Ultimately, Hardey would manufacture three sets of trailers, or six trailers in all. Harkala testified that eventually Hardey would have been able to manufacture 12 to 18 trailers per year. Record at 1042. This capability coincided with Hallowell's goal of putting a fleet of twenty trailers on the Turnpike, capable of delivering 1,000 tons of aggregate a day. Record at 1274.

While the trailers were being manufactured, Hallowell was taking care of other business. At that time, the state of Florida allowed the use of double trailers only on the Turnpike, not on any other state or federal highways. This complicated Hallowell's round trip concept, and necessitated the purchase or construction of a "staging area" at each end of the Turnpike. At the end of each haul, CAT would have to pull off the Turnpike into the staging area,

7. At trial, Hallowell estimated that sand which sold for $1.50 a ton in Orlando would bring $4.50 a ton in the Miami area. Conversely, rock selling for $3.00 in the Miami area would sell for $7.00 in the Orlando area.

8. Included in this figure was a bank loan of $10,000.

9. Jerry DeGarmo, a former vice president for FRI, testified that regardless of the type of trailer used, the aggregate deposited would have to be picked up with a front-end loader and moved. Further, the difference in cost between moving rock dropped by a rear dump

trailer and moving rock dropped by a bottom dump trailer "would be negligible." Apparently, any preference for the use of rear dump trailers stems from the reduced likelihood of inadvertently mixing the stockpiles in the delivery yards. See Record at 1023–30. The mixing of stockpiles containing different sizes or grades of aggregate could have disastrous results for the concrete or asphalt produced. Moreover, because concrete and asphalt producers are largely dependent upon public contracts, their products are subject to strict quality controls. See also infra note 18.

whereupon the two trailers would be unhitched. A tractor would then haul each trailer separately to its delivery destination, and then back to the staging area where it would be exchanged for the other trailer. The same procedure would then be carried out in order to load the two trailers. After loading and rehitching, the double trailer unit would begin its return journey up the Turnpike.[10]

Next, Hallowell set about obtaining a Certificate of Public Necessity and Convenience from the Florida Public Service Commission. After failing to secure a 10-county Certificate from a friend, he arranged to purchase a statewide Certificate from the Osceola Construction Company in Pensacola for $25,000. After purchasing two tractors from International Harvester[11] and receiving the first set of trailers from Hardey Manufacturing, Hallowell secured approval and licensing from the Turnpike Authority for his equipment and his drivers. By October of 1978, CAT was ready to begin operations.

Because the viability of CAT depended upon its ability to haul to both ends of the Florida Turnpike, the hours of operation of its customers and suppliers were extremely important. In particular, it was critical to CAT's success that there be a customer for Miami rock in the Orlando area that would be able to take deliveries 24 hours a day. Only with the unrestricted delivery schedule at the north end of the "circuit" could CAT hope to maximize the use of two-way hauling and operate at a profit. *See* Record at 1014–15, 1298–300, 1491–92.

By November of 1978, CAT had lined up customers at both ends of the Turnpike. Typically, CAT would begin a two-way haul by loading its trailers with sand at the north end of the trip. This sand would be supplied by a mine in the Clermont area which would be open 24 hours a day for loading. Once the loaded trailers had been individually shuttled to the staging area on the Turnpike they would be hitched together for the journey south. After a three-hour journey, the sand would be delivered to construction outfits in the West Palm Beach area. CAT's first customer for Clermont sand was Mack Concrete. Later CAT changed over to Rinker Materials Corporation ("Rinker") because of more advantageous delivery hours.

Ideally, CAT would arrive at the Rinker Lake Worth plant in West Palm Beach just as it opened at 7 a.m. After dumping the sand at Rinker, each empty trailer would be shuttled back out to the Turnpike and hitched together for the trip to Rinker's stone mines in the Miami area.[12] Because Rinker's Miami stone operation generally closed its gates at 3:30 p.m., CAT would aim for a noon arrival at the Miami staging area. Here, once again each trailer would be unhitched and shuttled to the Rinker mine one at a time. Loading the trailers in this manner would take approximately two hours, allowing CAT to begin the journey north at approximately 2 p.m. in the afternoon. Because of the distance involved, as well as the time that would be lost in the shuttle maneuver at the staging area at the north end of the Turnpike, rarely could CAT arrive at its north delivery point for Miami rock earlier than 8 p.m. Hence the necessity for a customer at the north end with 24-hour delivery. *See* Record at 1281–83, 1491–92.

From November of 1978 until mid-August of 1979, CAT's northern delivery point customer for aggregate rock[13] transported

---

**10.** Eventually, Hallowell intended to station one cab permanently at each staging area to handle all off-Turnpike duties, including loading and unloading aggregate material. This would free up at least one driver to handle only over-the-road hauling down the Florida Turnpike. Maximum efficiency would be reached with the use of one over-the-road tractor running a continuous circuit between Orlando and West Palm Beach, and one shuttle tractor at each end of the turnpike servicing up to six hopper trailers. *See* Record at 1421–23.

**11.** The cost of the first tractor was $50,000, the second $165,000.

**12.** Rinker owned two stone mines in the area: Rinker Lake Worth and FEC.

**13.** The type of stone being carried from Rinker in Miami to Southern Paving outside of Orlan-

from Rinker in Miami was Southern Paving Co., which was located just south of Orlando on the Florida Turnpike. Southern Paving's Orlando facilities were open on a 24-hour basis. In June of 1979, CAT received its second shipment of double trailers from Hardey, and began using them in its deliveries between Miami and Orlando. On August 10, however, CAT was terminated by Southern Paving, and had to seek another customer on the northern end of its route which would be open on a 24-hour basis.[14]

CAT's first attempts to secure other purchasers of stone in the Orlando area proved fruitless. By late August, however, CAT was able to obtain the business of a customer which was open 24 hours a day, and on August 29 CAT began hauling rock from Rinker in Miami to Basic Asphalt Company ("Basic") in Orlando.

When negotiating with Basic, Hallowell had dealt directly with Scott Carlson, Basic's vice president. According to testimony at trial, Hallowell offered Carlson a shipping price for Miami stone that was $.71 per ton less than what Carlson was paying other trucking outfits for the delivery of stone produced in the Orlando area. According to Hallowell, he and Carlson reached "an understanding or an agreement" that CAT would haul 5,000 tons of rock from Miami—approximately two and one-half months of work. Record at 1290.[15] CAT began haul-

ing rock to Basic almost immediately and continued doing so until CAT was terminated on September 21, 1979.[16] The events surrounding this termination by Basic form the basis for the present controversy.

According to Hallowell, Scott Carlson phoned his home on a Wednesday evening, when he was not home. Upon returning Carlson's call, Hallowell was told not to haul any more material to Basic. Hallowell testified that Carlson said:

Well, I got word from Florida Rock that they don't want us to get any more material out of Miami.... Al, these people came and told me that if I got any more rock out of Miami, they were damn sure going to shut off allocation from Brooksville.[17]

Record at 1306. Hallowell then called Ted Baker, the president of FRI and an old friend, who said that he would look into the matter. On Saturday of that week, Baker called Hallowell back and told him that the threat had been a mistake and that Basic had complained about the way that CAT was delivering the aggregate.

According to officials for Basic and FRI, coercion was not involved in the termination of CAT. Rather, Hallowell's choice of hopper trailers instead of rear dump trailers resulted in the inadvertent mixing of different types of aggregate in the unloading areas.[18] Further, there was testimony to

do was known as "three-eighths stone," and was customarily used for making asphalt.

**14.** In its original complaint, CAT alleged that Southern Paving had been coerced by one of its Orlando stone suppliers, Florida Crushed Stone, into terminating CAT's delivery of stone from Rinker in Miami. Subsequently, CAT stipulated to the granting of a summary judgment against it on its claim against Florida Crushed Stone. Record at 525.

**15.** Whether Carlson actually agreed to such an arrangement was a matter of some dispute at trial. *See infra* Section V(A).

**16.** Invoices show that CAT shipped rock one day, missed the following week for unexplained reasons, then shipped four days for each of the following two weeks. In all, CAT shipped approximately 850 tons of aggregate up until its termination.

**17.** The significance of the term "allocation" is discussed below at note 56. Testimony at trial disclosed that FRI was Basic's major supplier of aggregate. After Basic stopped receiving Miami rock from Rinker, through CAT, its only purchases for at least three months were from FRI.

**18.** Aggregate brought out of the Miami mines typically has a lighter specific gravity than aggregate found in the Brooksville-Orlando area. As a result, it is not perfectly interchangeable with the Brooksville rock. For this reason, the two types of aggregate could not be mixed in the same stockpile. Although asphalt might be comprised of several different types of rock, including both types of aggregate, a special mix would be required. Obviously, then, stockpiling different types of aggregate in the same yard would increase the likelihood of mixing those types, particularly if deliveries were made in a careless manner. The use of

the effect that more labor was needed to move the narrow windrows of aggregate deposited by a hopper trailer than would be necessary to move the more concentrated piles left by rear dump trailers.[19] Thus, the defendants' position was that CAT's termination by Basic was merely a business decision based upon CAT's inability to perform as expected.[20]

The Monday after CAT's termination by Basic, CAT began delivering the stone from Rinker in Miami to the Rinker South Orange Concrete Plant south of Orlando. The substitution of Rinker South Orange for Basic, however, suffered one major flaw: Rinker South Orange closed for deliveries at 5 p.m. Hallowell and his drivers testified that the original concept of one round trip every 18 to 20 hours was impossible under this arrangement. Although on occasion Rinker would remain open beyond 5 p.m., generally CAT was unable to complete its circuit of deliveries. As a result, CAT's drivers would have to lay over for the night in Orlando and make their deliveries at Rinker South Orange in the morning. Each such morning delivery meant a loss of $500 for CAT. *See* Record at 1324–25.

CAT continued hauling from Rinker in Miami to Rinker South Orange for approximately 8 weeks. During this time, CAT was unable to find another 24-hour customer at the north end of the circuit. Unable to generate enough revenue to continue in business, CAT was forced to return its trailers to Hardey Manufacturing in December.[21] At approximately the same time, CAT's insurance policies were cancelled. By the end of the year, CAT had ceased all operations.

On March 10, 1980, CAT filed its complaint against FRI alleging violations of §§ 1 and 2 of the Sherman Antitrust Act. CAT alleged that FRI, as a major supplier of construction aggregate in the Central Florida area, had coerced Basic into an agreement to cease purchasing aggregate hauled by CAT from competing Miami aggregate mines. Subsequently, CAT dropped its § 2 claim against FRI, and proceeded to trial only on the § 1 claim. The case was submitted to the jury on a theory of per se illegality and on April 17 the jury returned a $300,000 verdict for CAT. Damages were trebled pursuant to 15 U.S.C.A. § 15(a) and FRI noticed this appeal.

---

rear-dump loaders generally would minimize this risk. *See* Record at 1023–25.

Hopper trailers are most effective when the delivery facility utilizes "hoppers" for receiving the aggregate. The hopper consists essentially of a cone-shaped receptacle leading to a conveyer belt and covered by a grate. The hopper trailer is driven over the grated surface and its bottom doors are opened to allow aggregate to fall into the receptacle, where it is carried by the conveyer belt to a storage facility. If a particular customer used hoppers, there would be little chance of mixing different types of aggregate. Neither Southern Paving nor Basic used hoppers, however. As a result, unloading aggregate from a hopper trailer could be a more complicated operation. *See* Record at 1294.

**19.** On the other hand, there was testimony that the customer would have to use a payloader to move the delivery piles into more condensed stockpiles regardless of whether delivery was made by a rear-dump trailer or a hopper trailer. *See* Record at 1319.

**20.** According to FRI's sales representative, Walter McFall, the person who allegedly threatened Basic, when he asked Jake Scherf of

Basic why CAT had been terminated, Scherf responded:

> Walter, it wouldn't work out. They were scattering the material all over our stockpile area. Each morning that I would come in, I would either have to get on the front end loader or one of my people would have to get on the front end loader and stockpile the material every morning. And it just didn't work out to [sic] their behalf.

Record at 1541. Hallowell and two of his drivers, however, testified that they had never received any complaints about the way in which they had delivered aggregate. According to Ted Baker, president of FRI, Carlson told him that if McFall had said anything to him that appeared to be a threat of economic coercion, "he would take that as a joke because he and Walter were very close friends." Record at 1563. According to Hallowell, Baker told him that "Walter McFall threatened them out there, but, hell, he was only kidding." Record at 1307.

**21.** For a brief period shortly before its demise, CAT resumed doing a more limited form of business with Southern Paving. *See* Record at 1377–83.

FRI alleges the following errors: (1) CAT lacked standing to sue under § 4 of the Clayton Act; (2) CAT's failure to show any restraint on interstate commerce deprived the court of subject matter jurisdiction; (3) the court erred in instructing the jury under a theory of per se illegality; (4) the alleged antitrust violation by FRI did not injure CAT or force it out of business; and (5) there was insufficient evidence to support the $300,000 damage award. After a close examination of the record, we conclude that the trial court did indeed err in sending this case to the jury under an instruction on per se illegality. Accordingly, we remand for a new trial.

## II. STANDING

 Section 4 of the Clayton Antitrust Act provides a private cause of action for damages to:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws
> . . . .

15 U.S.C.A. § 15 (West Supp.1983). Read literally, this provision would confer antitrust standing on business organizations far removed from those areas of the economy actually affected by an anticompetitive act. To eliminate the possibility of remote liability, courts have interpreted the "by reason of" language of § 4 as creating a requirement of standing. The test for standing adopted by this circuit[22] is the "target area" test: The plaintiff must show that he is within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry.

E.g., Associated Radio Service Co. v. Page Airways, Inc., 624 F.2d 1342, 1362 (5th Cir. 1980), cert. denied, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981); Larry R. George Sales Co. v. Cool Attic Corp., 587 F.2d 266, 271–72 (5th Cir.1979); Donovan Construction Co. of Minnesota v. Florida Telephone Corp., 564 F.2d 1191, 1192 (5th Cir.1977), cert. denied, 435 U.S. 1007, 98 S.Ct. 1878, 56 L.Ed.2d 389 (1978); Yoder Brothers, Inc. v. California-Florida Plant Corp., 537 F.2d 1347, 1359 (5th Cir.1976), cert. denied, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); Southern Concrete Co. v. U.S. Steel Corp., 535 F.2d 313, 316 (5th Cir.1976), cert. denied, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); Tugboat, Inc. v. Mobile Towing Co., 534 F.2d 1172, 1175 (5th Cir.1976); Jeffrey v. Southwestern Bell, 518 F.2d 1129, 1131 (5th Cir.1975); Battle v. Liberty National Life Ins. Co., 493 F.2d 39, 49 & n. 10 (5th Cir.1974), cert. denied, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975). See generally Associated General Contractors of California, Inc. v. California State Council of Carpenters, —— U.S. ——, —— – —— & n. 33, 103 S.Ct. 897, 907–08 & n. 33, 74 L.Ed.2d 723, 736–37 & n. 33 (1983) (discussing various tests used by courts of appeals).[23] Thus, the task before this court is to identify the area or areas of the economy adversely affected by the alleged anticompetitive act and then to determine whether the claimed injury occurred within those areas. See Yoder Brothers, Inc. v. California-Florida Plant Corp., 537 F.2d at 1359. By engaging in this analysis, we can safely limit the class of

**22.** In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Id. at 1209. Cf. Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir.1982) (adopting as binding precedent all post-September 30, 1981, decisions of Unit B of former Fifth Circuit).

**23.** Only rarely has the Supreme Court spoken directly to the issue of standing. See Associated General Contractors of California, Inc. v. California State Council of Carpenters, supra; Hawaii v. Standard Oil Co., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); Perkins v.

Standard Oil, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969). In Blue Shield of Virginia v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), the Court did not rely directly on any of the various tests used by the courts of appeals. It also expressed no opinion as to the relative utility of these tests. In concluding that the plaintiff in that case was "within that area of the economy ... endangered by [the] breakdown of competitive conditions," however, id. at ——, 102 S.Ct. at 2549, 73 L.Ed.2d at 162, the Court implicitly sanctioned continued, flexible use of the "target area" test.

potential plaintiffs to those persons who will most adequately vindicate the purposes of the antitrust laws. *See Jeffrey v. Southwestern Bell,* 518 F.2d at 1131.

 The starting point in our analysis is CAT's complaint against FRI. *See Yoder Brothers, Inc. v. California-Florida Plant Corp.,* 537 F.2d at 1359 (standing to sue is preliminary matter to be evaluated upon allegations of complaint).[24] According to the complaint, FRI engages in two businesses relevant to our inquiry. FRI is:

A large producer of construction aggregate and sand used in the manufacturing of asphalt and also used in roadbuilding, construction fill and the manufacture of concrete in Florida.

. . . .

Likewise, in addition to owning and operating aggregate and sand mines in Florida, the defendant, FRI, through majority stock interests, controls a significant portion of the hauling industry in Florida; specifically, the aggregate, sand and construction materials hauling business. Upon information and belief, plaintiff says that the defendant, FRI, controls approximately 35% of the hauling industry described above in Florida.

Record at 4.

The complaint describes FRI's alleged anticompetitive actions:

The nature of the economic coercion alleged herein essentially took the form of threating [sic] to cut off the sale and supply of mined aggregate materials to such hauling customers unless they agreed to contract for the hauling of such products only from those aggregate haulers owned or controlled by the defendant FRI.

. . . .

With respect to Basic Asphalt, agents or employees of the defendant FRI coerced Basic Asphalt into a contract, combination or conspiracy to terminate the then extant business relationship between the plaintiff and Basic Asphalt.

Record at 5–6.

CAT's standing argument apparently is two-fold. First, it argues that because FRI competes for the aggregate hauling business in Central Florida through its wholly owned subsidiary Florida Rock and Tank Lines, Inc. ("Tank Lines") then the relevant sector of the market affected by FRI's acts was the aggregate hauling industry.[25] Secondly, CAT argues that because its unique operation made possible the marketing of Miami stone in the Orlando area, its operation was an essential aspect of the aggregate production industry.

FRI contends that any alleged coercion was aimed at the competition in aggregate production and not in aggregate hauling. Thus, FRI argues that insofar as its acts were aimed at eliminating competition from Rinker's Miami stone mines, the sector of the market affected was the *production* of stone aggregate used in the Florida construction industry.

 In our view, FRI characterizes CAT's allegations much too narrowly. The complaint clearly alleges that FRI attempted to eliminate competition from CAT in the aggregate hauling industry. According to the complaint, therefore, one area of the market that would be adversely affected by the alleged conduct of FRI would be the aggregate hauling industry. CAT clearly operated within this market; examination of the complaint thus demonstrates CAT's standing to challenge FRI's alleged anticompetitive behavior.

FRI's contentions, however, appear to rest on two implicit assumptions which should be addressed. First, FRI contends that the evidence introduced at trial belies CAT's claim that the target market was the

---

**24.** Ultimate proof of injury in fact is not required in order for a plaintiff to have standing to sue. *Yoder Brothers, Inc. v. California-Florida Plant Corp.,* 537 F.2d at 1360 n. 6. Otherwise, preliminary litigation over the threshold question of standing would result in a "trial on the merits."

**25.** In 1979, Tank Lines owned and operated approximately 350 aggregate trucks in the state of Florida, which generated revenues of about $10–12 million. Record at 1558–59.

hauling industry. Rather, FRI suggests, the proof at trial indicated that the target market was the aggregate production industry. As we noted earlier, however, "standing to sue is a preliminary matter, to be evaluated upon the allegations of the complaint." *Yoder Brothers, Inc. v. California-Florida Plant Corp.,* 537 F.2d at 1359. Even were we to go beyond the face of the complaint, we would disagree with FRI's contention. On the one hand, Mr. Hallowell's testimony, described earlier, does suggest that the precise target of FRI's coercion was competition from Rinker's Miami stone mines. Testimony by Walter McFall, the FRI agent who allegedly coerced Basic, suggests a different conclusion. Although McFall denied having threatened to cut off Basic's allocation of FRI rock, he did give his version of a conversation which occurred between himself and Jake Scherf, vice president in charge of production at Basic. According to McFall, CAT's hauling to Basic, and not the source of the rock being hauled, was the starting point for the conversation.[26] Thus, the record actually developed at trial is not conclusive, and suggests that both the aggregate production and the aggregate hauling industries were potential targets of FRI's acts.

This ambiguity in the testimony is related, in our view, to the second assumption implicit in FRI's argument: that only one discrete sector of the market may be the target for a particular anticompetitive act. Nothing in our cases, however, requires such a narrow interpretation of the target area test. In fact, the Supreme Court recently sanctioned an analysis of standing which expressly recognizes that different areas of the market may be so closely related that both may be targets of the same anticompetitive act. *See Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).

◼ Our analysis of standing is aimed at determining whether the plaintiff's injuries are merely indirect, secondary, or remote, *id.* at 476–81, 102 S.Ct. at 2547–49, 73 L.Ed.2d at 159–62; its purpose is to ensure against potentially disastrous recoveries by those only tenuously harmed. *Jeffrey v. Southwestern Bell,* 518 F.2d at 1131. Few of the cases cited by FRI involve an anticompetitive act aimed at either or both of two closely related markets in which the defendant is engaged.[27] FRI, however, clearly has an economic interest in two separate markets: the construction aggregate

**26.** McFall testified as follows:

Well, I went in to talk to Jake as I do periodically, and I asked Jake the question. I said, "Jake, is it true that Construction Aggregate is hauling materials into your operation?" And Jake's answer was yes. He said they have hauled a few loads of material in here. And my next question to Jake is, "Is the material working out for you?" And Jake kind of nodded his head and said, "Not too well." I said, "Jake," I said, "You know our problems that we are having at Brooksville as far as the stockpiles of materials there. And you and I have discussed many times in the past about keeping your stockpile of material up." And Jake said, "I know that." "The only thing I can suggest to you is if you use a load of material or three loads a day, I would certainly replenish that material each day so that stockpile would not go down." I said, "Because at the quarry at Brooksville, if your stockpile should go down and you should need a large quantity of material say in the neighborhood of 40, 50, 60 loads in a short period of time, in a day or two period of time," I said, "Due to our stockpile condi-

tions at Brooksville, I don't know whether we will be able to get you that large quantity of material or not."

Record at 1536–37.

**27.** This is not a case like *Associated Radio Service Co. v. Page Airways, Inc.,* 624 F.2d 1342 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981), in which the relationship between the plaintiff and the defendant was purely vertical in market terms. In *Page,* a supplier of Grumman Avionics equipment sued an installer of that equipment for attempting to drive out another installer. Thus, there was no direct competition between the plaintiff and the defendant. The only market in which the defendant had an interest in restraining competition was the installation of avionics equipment. Therefore, it was most appropriate in *Page* to allow a direct competitor of the defendant to attempt to vindicate the interests which underlie antitrust enforcement. 624 F.2d at 1362–63; *see Associated General Contractors of California, Inc. v. California State Council of Carpenters,* —— U.S. at —— ——, 103 S.Ct. at 910–11, 74 L.Ed.2d at 740–41.

production industry and the construction aggregate hauling industry. While these markets might generally be viewed as separate for most purposes, in the specific context of this case they are not. Even if FRI's conduct was aimed most directly at restraining competition for the production of aggregate, FRI must have foreseen that the direct effect of such a restraint would be to eliminate an innovative competitor from the field of aggregate hauling—a field in which FRI through its wholly owned subsidiary, Tank Lines, was a dominant factor.

The Supreme Court's recent decision in *Blue Shield of Virginia v. McCready, supra,* provides strong support for our position. In *McCready,* a Blue Cross subscriber denied reimbursement for the costs of treatment by a psychologist brought a § 1 claim against her insurer, whose policy it was to reimburse costs incurred only during treatment by a psychiatrist. Although acknowledging that the apparent goal of the conspiracy was to restrict competition by psychologists, the Court nonetheless held that the subscriber had standing to sue. First, the Court looked to the "physical and economic nexus" between the violation and the harm to the plaintiff:

> The harm to McCready and her class was clearly foreseeable; *indeed, it was a necessary step in effecting the ends of the illegal conspiracy.* Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question, but that the loss was precisely "the type of loss that the claimed violations ... would be likely to cause."

*Id.* at 479, 102 S.Ct. at 2549, 73 L.Ed.2d at 161 (emphasis added) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). Next, the Court turned to an examination of the relationship between the injury alleged and those injuries about which Congress was concerned when it provided private remedies under § 4 of the Clayton Act. Again, the Court focused on the inextricable relationship between the competitive injury the conspirators sought to inflict—elimination of the psychologists as Blue Cross competitors—and the injury suffered by the subscriber—increased costs for psychologists' services. 457 U.S. at 483, 102 S.Ct. at 2550–51, 73 L.Ed.2d at 163–64. In our view, it is particularly significant that the Court recognized that the "target area" test does not require a conspiratorial purpose to injure the *particular individual bringing suit. Id.* at 479 n. 15, 102 S.Ct. at 2548 n. 15, 73 L.Ed.2d at 161 n. 15.

▮ In the instant case, and on the basis of the Court's reasoning in *McCready,*[28] we cannot say that CAT's injury was too "fortuitous," "incidental," or "remote" to allow for a § 4 action. Rather, whatever the specific motivation behind FRI's act, injury to the aggregate hauling industry, and hence CAT, was a necessary step. Indeed, that FRI's subsidiary, Tank Lines, competed with CAT for the aggregate hauling business in Florida strongly suggests that FRI's goal *was* the elimination of CAT. Thus, the evidence supports the conclusion that the aggregate hauling industry in Florida was a sector of the economy which was endangered by a breakdown of compet-

---

**28.** Recently, the Supreme Court further refined the standing analysis used in *McCready.* In *Associated General Contractors of California, Inc. v. California State Council of Carpenters, supra,* a union alleged that members of a contractors' trade association coerced member and nonmember contractors and landowners to give some of their business to nonunion contracting firms, thereby injuring unionized firms, as well as the business activities of the unions. In denying the union standing, the Court examined the following factors: (1) the causal connection between the alleged violation and the injury to the plaintiff; (2) the intent to cause harm to the plaintiff; (3) the nature of the injury, *i.e.,* whether the plaintiff was either a consumer of the defendants' goods or a competitor of the defendants; and (4) the directness of the injury. The Court concluded that the plaintiff union was neither a consumer nor a competitor of the defendants; in particular, the Court noted that "the existence of more direct victims of the alleged conspiracy" (unionized firms) should ensure adequate protection of the markets *directly* involved. Finally, the Court found it significant that the type of harm allegedly suffered by the union was more clearly the concern of the labor laws. In our view, *Associated General Contractors* does not alter our conclusion.

itive conditions. *See Yoder Brothers, Inc. v. California-Florida Plant Corp.,* 537 F.2d at 1359–61 (suit allowed by distributor of restricted product where more than one area of economy affected); *Tugboat, Inc. v. Mobile Towing Co.,* 534 F.2d at 1176–78 (union had standing to challenge anticompetitive behavior by owners of tugboats attempting to monopolize tugboat industry).

## III. SUBJECT MATTER JURISDICTION

■ FRI next contends that the trial court lacked subject matter jurisdiction because CAT failed to demonstrate the necessary restraint on interstate commerce. Absent an adequate showing by the plaintiff that the defendants' conspiracy will result "in restraint of trade or commerce among the several states," 15 U.S.C.A. § 1, the plaintiff's claim must be dismissed.

■ It is well established that jurisdiction under the Sherman Act does not require that the activities in question actually occur in interstate commerce. *See McLain v. Real Estate Board of New Orleans,* 444 U.S. 232, 241, 100 S.Ct. 502, 508, 62 L.Ed.2d 441 (1980); *Brett v. First Federal Sav. & L. Ass'n,* 461 F.2d 1155, 1157 (5th Cir.1972). Rather, the reach of the Sherman Act is coextensive with Congress' power under the Commerce Clause. *See McLain v. Real Estate Board of New Orleans,* 444 U.S. at 241, 100 S.Ct. at 508; *United States v. Southeastern Underwriters Ass'n,* 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944); *United States v. Cargo Service Stations, Inc.,* 657 F.2d 676, 679–80 (5th Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982); *Chatham Condominium Ass'n v. Century Vil-*

*lage, Inc.,* 597 F.2d 1002, 1007–08 (5th Cir. 1979).[29] The cases establish that the Sherman Act was intended to reach activities that "while wholly local in nature, nevertheless substantially *affect* interstate commerce." *McLain v. Real Estate Board of New Orleans,* 444 U.S. at 241, 100 S.Ct. at 508 (emphasis added). The jurisdictional requirement of the Sherman Act may therefore be satisfied by proving either that the business activities occurred in commerce or that those activities had an effect on commerce. *Id.* at 242, 100 S.Ct. at 509. "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *United States v. Womens Sportswear Association,* 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949); *see Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 743, 96 S.Ct. 1848, 1851, 48 L.Ed.2d 338 (1976); *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974).[30]

The plaintiff, CAT, is a Florida corporation engaged in business only within the state of Florida. Materials hauled by CAT originated in Florida rock and sand mines, and were delivered to Florida customers for use in construction projects within the state of Florida. The defendant, FRI, also is a Florida corporation, listed on the American Stock Exchange, which also engages in purely intrastate business. FRI produces sand and construction aggregate which are used in the manufacturing of concrete and asphalt. The record does not demonstrate the existence of any customers of either FRI or Basic in states other than Florida. Thus, it is clear that the "in commerce" or "flow of commerce" theory of jurisdiction is

**29.** As we have stated:
 any challenge to subject matter jurisdiction in a Sherman Act case is necessarily resolved by answering the following question: Can Congress prohibit the challenged conduct under the Commerce Clause? If so, then the conduct is within the jurisdictional reach of the Sherman Act.
 *Chatham Condominium Ass'ns v. Century Village, Inc.,* 597 F.2d at 1008.

**30.** It is also well established that the existence or absence of an intent to affect interstate com-

merce is not dispositive when determining subject matter jurisdiction under the Sherman Act. *See Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. at 744–45, 96 S.Ct. at 1852. Neither is it necessary to prove that the antitrust violation itself affected commerce. *See Western Waste Serv. v. Universal Waste Control,* 616 F.2d 1094, 1097 (9th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980).

not available to CAT. Rather, CAT must rely on the "affecting commerce" branch of Sherman Act jurisdiction.

In *McLain v. Real Estate Board of New Orleans, supra,* the Supreme Court discussed at length the appropriate analysis under the "affecting commerce" test. "[I]t is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce." 444 U.S. at 242, 100 S.Ct. at 509. Rather, the plaintiff must allege and prove that the relevant local activity "has an effect on some other appreciable activity demonstra-

bly in interstate commerce." *Id.* Further, the plaintiff must demonstrate that the local activities "as a matter of practical economics" have a not insubstantial effect on the interstate commerce involved. *Id.* at 242–46, 100 S.Ct. at 509–11. *See also Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. at 743–47, 96 S.Ct. at 1851–53; *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. at 202, 95 S.Ct. at 402.[31]

In our view, CAT introduced substantial evidence of its relationship with interstate markets. For example, the steel used to fabricate the trailers purchased by

---

**31.** In *McLain,* the Court referred generally to the local activities of the defendant. Thus, *McLain* can be read as limiting our inquiry to the relationship between relevant local activities of the defendant and interstate commerce. *See Western Waste Serv. v. Universal Waste Control,* 616 F.2d at 1097 n. 2 (focus of inquiry is on defendant's business). In our view, such an analysis is too restrictive, and is not supported by the case law. First, *McLain* involved plaintiffs who were consumers rather than businesses. *See also Chatham Condominimum Ass'ns v. Century Village, Inc.,* 597 F.2d 1002, 1005–10 (5th Cir.1979); *City of Fort Lauderdale v. East Coast Asphalt Corp.,* 329 F.2d 871, 872–73 (5th Cir.), *cert. denied,* 379 U.S. 900, 85 S.Ct. 187, 13 L.Ed.2d 175 (1964); *cf. United States v. Employing Plasterers Ass'n,* 347 U.S. 186, 189, 74 S.Ct. 452, 454, 98 L.Ed. 618 (1954) (criminal prosecution); *United States v. Cargo Service Stations, Inc.,* 657 F.2d 676, 678 (5th Cir.1980) (same), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). In such cases there will be little alternative to concentrating on the defendant's activities.

More importantly, however, the antitrust laws are concerned primarily with the integrity of interstate markets. The starting place for analysis, therefore, is the relationship between the defendant's business and interstate markets, in particular the effect the defendant's business will have on those markets. Most often this effect will be readily apparent because the defendant engages directly in interstate commerce, and any restrictive conduct has an immediate impact on the particular goods or services involved. *See Kypta v. McDonald's Corp.,* 671 F.2d 1282 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 127, 74 L.Ed.2d 109 (1982). Beginning the inquiry with an examination of the defendant's activities, however, does not mean that the plaintiff's relationship with interstate markets is irrelevant. Occasionally the relationship between the defendant and interstate commerce becomes apparent

only by examining the relationship between the defendant and other businesses. Hypothetically, a business engaged in purely intrastate commerce could restrain trade in interstate commerce through its local conduct with regard to businesses that enjoy substantial ties to interstate commerce. Thus, when determining whether interstate commerce is affected by an alleged violation courts will often examine both the defendant's relationship with interstate markets and the plaintiff's. Such an approach makes good sense because injury to the plaintiff may result directly in injury to the market. *See, e.g., Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 741, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976) (local actions by defendants to block relocation of hospital adversely affects interstate commerce with regard to medicines and supplies *purchased by hospital* ); *Lehrman v. Gulf Oil Corp.,* 464 F.2d 26, 34–35 (5th Cir.) (demise of plaintiff's business had impact on interstate flow of goods he would have sold) (alternative holding), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); *Heille v. City of St. Paul,* 671 F.2d 1134, 1137 (8th Cir.1982) (examining both plaintiff's and defendant's use of goods manufactured out-of-state); *Turf Paradise, Inc. v. Arizona Downs,* 670 F.2d 813, 819 (9th Cir. 1980) (examining, *inter alia,* plaintiff's relationship with out-of-state corporations), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982). *See generally* I E. Kintner, Federal Antitrust Law § 6.5, at 294 n. 41 (1980); I P. Areeda & D. Turner, Antitrust Law ¶ 232, at 234 (1978) (necessary relationship between defendant and interstate commerce may "consist in injuring plaintiffs who purchase supplies from interstate markets"). In our view, therefore, the proper inquiry is one which focuses on the interstate markets involved in both the defendant's and the plaintiff's operations, and seeks to determine whether the defendant's business conduct will likely make its presence known in those markets.

CAT was fabricated in Pennsylvania.[32] The mechanism used to connect CAT's double trailers, called a "fifth wheel" or "dolly," was produced in Holland, Michigan. Further, the purchase of trailers by CAT was financed by the Ford Motor Credit Co., a national corporation. *See McLain v. Real Estate Board of New Orleans*, 444 U.S. at 245, 100 S.Ct. at 510; *Hospital Building Co. v. Trustees of the Rex Hospital*, 425 U.S. at 743–45, 96 S.Ct. at 1851–52; *United States v. Employing Plasters Ass'n*, 347 U.S. 186, 187–88, 74 S.Ct. 452, 453, 98 L.Ed. 618 (1954); *Heille v. City of St. Paul*, 671 F.2d 1134, 1136–37 (8th Cir.1982); *Western Waste Serv. v. Universal Waste Control*, 616 F.2d 1094, 1097 (9th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980). Finally, the two tractors purchased by CAT to haul its double trailers were manufactured out of state by International Harvester. *See* Appellant's Brief, at 26; Record at 1034–38. Plaintiff's exhibit number 11 demonstrates that the sale of these tractors was financed by the International Harvester Credit Corporation pursuant to a retail contract between IHCC and CAT. This exhibit, a notice of repossession and private sale, originated in IHCC's Atlanta office. *See Brett v. First Federal Sav. & L. Ass'n*, 461 F.2d at 1157.

The foregoing evidence demonstrates that the local conduct of the defendant with regard to the plaintiff will have a substantial effect on interstate markets. In particular, we note that at the time that CAT ceased operations it possessed but two tractors and three sets of double trailers. As envisioned, however, CAT ultimately would have had a need for at least 20 trailer units as well as a corresponding number of tractors with which to haul those units, and the financing with which to purchase the tractors and trailers. If FRI was indeed responsible for the demise of CAT, then it necessarily follows that FRI is equally responsible for the decrease in demand for the tractors and trailers which CAT would have consumed. In our view, this presents the

likelihood of a not insubstantial effect on interstate commerce. *See Hospital Building Co. v. Trustees of the Rex Hospital*, 425 U.S. at 743–46, 96 S.Ct. at 1851–53 (defendants' efforts to block relocation of plaintiff hospital adversely affects interstate commerce with regard to medicines and supplies purchased by hospital); *Western Waste Serv. v. Universal Waste Control*, 616 F.2d at 1097.

In addition to the foregoing argument, CAT has pursued a second theory of jurisdiction. According to CAT's complaint:

Florida Rock and its subsidiaries currently have gross sales of more than $90 million, a substantial amount of which consisted of sales of concrete, concrete products, sand, aggregate, road base materials, and hauling services used in the construction of roads, highways, airports and intercoastal waterways in Florida and other states, used in interstate travel and commerce. Monies used in the purchase of such products and materials for construction of roads, highways, and airports are, in large part, Federal funds, collected and redistributed in interstate commerce. Sales of Florida Rock products, and utilization of said materials and services, have a direct, substantial effect upon interstate commerce.

Record at 2. Thus, CAT argues that the use of FRI's products in instrumentalities of interstate commerce gives rise to jurisdiction under the Sherman Act. Further, at trial there was testimony that FRI's co-conspirator, Basic, had since 1978 been a supplier of construction materials for federally funded road projects. Record at 1553–54. In addition, CAT introduced uncontroverted evidence that it had transported to an asphalt plant in Florida rock that ultimately was used in the construction of Interstate 95. Finally, rock hauled by CAT to Southern Paving was used in the construction of Orlando International Airport. Record at 1275–76. Thus, the evidence demonstrates that the defendant and the plaintiff

---

**32.** Moreover, the company which manufactured CAT's trailers was a division of an inter-

national corporation. Record at 1046–47.

engage in the production and transportation of materials which are necessary components of instrumentalities of interstate commerce.

In other statutory contexts, the Supreme Court has relied upon this "instrumentalities" theory to uphold the scope of Congress' regulatory enactments. *See Mitchell v. C.W. Vollmer & Co.,* 349 U.S. 427, 428–30, 75 S.Ct. 860, 861–62, 99 L.Ed. 1196 (1954) (repair of facilities of interstate commerce is activity in commerce within meaning of Fair Labor Standards Act); *Alstate Construction Co. v. Durkin,* 345 U.S. 13, 15–16, 73 S.Ct. 565, 566–67, 97 L.Ed. 745 (1953) (production of road surfacing products for local use in interstate highways constitutes interstate commerce because of relationship to instrumentality or facility of commerce). *See also City of Fort Lauderdale v. East Coast Asphalt Corp.,* 329 F.2d 871, 873 (5th Cir.) (conspiracy to fix prices of materials used in construction of interstate highways has necessary effect on commerce under Sherman Act), *cert. denied,* 379 U.S. 900, 85 S.Ct. 187, 13 L.Ed.2d 175 (1964). Because the Sherman Act sweeps as broadly as the commerce clause allows, CAT's argument would seem to have merit.

Both parties, however, have devoted much attention to the Supreme Court's decision in *Gulf Oil Corp. v. Copp Paving Co., supra.* *Copp* had its genesis in the Ninth Circuit's decision in *In re Western Liquid Asphalt Cases,* 487 F.2d 202 (9th Cir.1973). In the *Asphalt Cases,* the plaintiffs, processors of asphaltic concrete, brought claims against producers of asphaltic oil under §§ 1 and 2 of the Sherman Act, §§ 3 and 7 of the Clayton Act, 15 U.S.C.A. §§ 14 & 18 (West Supp.1983), and § 2(a) of the Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a) (West Supp.1983). The Ninth Circuit analogized the case to *Alstate Construction Co. v. Durkin, supra,* in which the Supreme Court held that businesses engaged in the local production of road surfacing products for local use in interstate highways were operating in commerce because of their relationship to an instrumentality or facility of interstate commerce. *See* 487 F.2d at 205. After concluding that the production of materials used in the construction of interstate highways was "in commerce" for purposes of the Sherman Act, the Ninth Circuit went on to hold that the same activities also were in commerce for purposes of the Robinson-Patman and Clayton Acts. *See id.* at 206. In granting certiorari, the Supreme Court limited its inquiry to whether jurisdiction was established under the Robinson-Patman and Clayton Acts. *See* 419 U.S. at 193, 95 S.Ct. at 397. Significantly, the Robinson-Patman Act and §§ 3 and 7 of the Clayton Act contain jurisdictional language that, read literally, is much narrower than that contained in the Sherman Act; each provision restrains the anticompetitive conduct only of persons "engaged in commerce." *See generally* Comment, 21 Vill.L.Rev. 721 (1976) (discussing jurisdictional elements under the various antitrust acts). In reversing the Ninth Circuit's finding of subject matter jurisdiction under the Robinson-Patman and Clayton Acts, the Court held that only anticompetitive action actually occurring "within the flow of interstate commerce" is actionable. 419 U.S. at 195, 95 S.Ct. at 398. The Court thus disavowed the Ninth Circuit's use of a test focusing on the relationship of the defendant's activities to an instrumentality of interstate commerce.

FRI admits that technically the Court's holding was limited to the narrower bases for subject matter jurisdiction which exist under the Robinson-Patman Act and §§ 3 and 7 of the Clayton Act. The Court clearly was concerned with Congress' *intent* when utilizing the "in commerce" language in those provisions. The Court cautioned that the plaintiff:

[w]ould have us expand the concept of the flow of commerce by incorporating categories of activities that are perceptibly connected to its instrumentalities. But whatever merit this categorical inclusion-and-exclusion approach may have when dealing with the language and purposes of other regulatory enactments, it does not carry over to the context of the Robinson-Patman and Clayton Acts. The chain of connection has no logical end

point. The universe of arguably included activities would be broad and its limits nebulous in the extreme. . . . More importantly, to the extent that those limits could be defined at all, the definition would in no way be anchored in the economic realities of interstate markets, the intensely practical concerns that underlie the purposes of the antitrust laws.

In short, assuming, arguendo, that the facially narrow language of the Clayton and Robinson-Patman Acts was intended to denote something more than the relatively restrictive flow of commerce concept, we think the nexus approach would be an irrational way to proceed. The justification for an expansive interpretation of the "in commerce" language, if such an interpretation is viable at all, *must rest on a congressional intent that the acts reach all practices, even those of local character, harmful to the national marketplace.*

*Id.* at 198–99, 95 S.Ct. at 400 (emphasis added). However, as the Supreme Court has made clear, just such an expansive interpretation was intended by Congress under the Sherman Act. *See Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. at 743 n. 2, 96 S.Ct. at 1852 n. 2 (decisions by Court have permitted reach of Sherman Act to expand along with expanding notions of Congressional power); *Alstate Construction Co. v. Durkin,* 345 U.S. at 14–16, 73 S.Ct. at 566–567.

FRI argues, however, that the Court's reasoning necessarily implicates jurisdiction under the Sherman Act because the Court counseled against relying on "nominal connections between commerce and activities that may have no significant economic effect on interstate markets." 419 U.S. at 199, 95 S.Ct. at 400. During the course of its ruling, the Court clearly dismissed the instrumentality theory as a basis for satisfying the "in commerce" language of the Robinson-Patman Act and §§ 3 and 7 of the Clayton Act. Nonetheless, the impact of *Copp* on Sherman Act jurisdiction is far from clear. Without deciding whether §§ 3 and 7 of the Clayton Act would admit of an "affecting commerce" theory the Court declared that effects on commerce could *not be presumed* from the mere use of materials in the production of instrumentalities of commerce. *Id.* at 202, 95 S.Ct. at 402. This holding, though technically limited to §§ 3 and 7 of the Clayton Act, casts some doubt on reliance on a relationship to instrumentalities of commerce under the Sherman Act. It casts some doubt on what would otherwise seem to be a logical approach in applying the "affecting commerce" theory in the Sherman Act context, namely to consider effects on interstate instrumentalities as one kind of effect on commerce; or in other words to consider the instrumentalities theory as a subset of the "affecting commerce theory." [33]

Whether or not *Copp* places limits on a litigant's ability to claim jurisdiction under the Sherman Act through relationships to

---

**33.** The movement of people has long been held to constitute commerce. Thus, businesses lying near interstate highways and serving interstate customers have the effect on commerce necessary to invoke jurisdiction under the Sherman Act. *See United States v. Cargo Service Stations,* 657 F.2d at 680, and cases cited therein. Obviously, the movement of people interstate, as well as the movement of goods in commerce, depends upon the elimination of impediments to that movement. Such impediments may consist of a scarcity of businesses serving interstate movement, *e.g.,* gasoline stations and motels; *see id.;* they may also consist of conditions which physically restrict such travel in a more direct way, such as the absence or destruction of the *means* of travel.

On the other hand, earlier Supreme Court cases determining whether Congress could reg-

ulate those engaged in the production of instrumentalities of commerce were concerned with statutes referring to those "engaged in commerce" or "engaged in the production of goods for commerce." *See, e.g., Alstate Construction Co. v. Durkin,* 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745 (1952); *Overstreet v. North Shore Corp.,* 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656 (1943); *Pedersen v. Delaware, Lackawanna & West. R.R.,* 229 U.S. 146, 33 S.Ct. 648, 57 L.Ed. 1125 (1913). This suggests that technically the "instrumentalities" theory is the offspring of the older "flow of commerce" theory. *See Thornhill Pub. Co. v. General Tel. & Electronics,* 594 F.2d 730, 737 (9th Cir.1979) (treating "instrumentalities" theory as a type of "in commerce test").

instrumentalities of interstate commerce is, in the last analysis, not necessary to resolve this case.[34] As we concluded above, CAT sufficiently demonstrated an effect on commerce by virtue of injury to interstate markets resulting from the defendant's alleged activities. We thus proceed to the merits of this dispute.

## IV. PER SE OR RULE OF REASON

FRI's next contention is that the trial court erred in submitting this case to the jury under a theory of per se illegality.[35] The complaint reveals that CAT's theory of liability was that FRI and Basic created and enforced a boycott aimed at driving the plaintiff out of business. Record at 6. At the charge conference conducted by the trial court, CAT thus argued that the case should be submitted to the jury under an instruction on per se illegality; under such an instruction CAT would not need to prove an anticompetitive effect in a relevant product and geographic market. *See Muen-*

**34.** It is worth noting that two well-known authorities have stated their reluctance to believe that the Supreme Court intended to narrow the scope of the Sherman Act, particularly in light of the Court's subsequent decision in *Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). Indeed, they point out that rarely has the Court required anything more than a reasonable presumption that certain activities affect interstate commerce. *See* I P. Areeda & D. Turner, *supra* note 31, ¶ 232, at 237–41. Moreover, *Copp* may represent no more than a deferential treatment of the district court's finding on that particular record of no substantial impact on interstate commerce. 419 U.S. at 202–03, 95 S.Ct. at 402.

However, the only other court to address a Sherman Act instrumentalities claim since *Copp* has expressed reluctance to apply the instrumentality theory to find the necessary effect on commerce to support Sherman Act jurisdiction. *See Thornhill Pub. Co. v. General Tel. & Electronics,* 594 F.2d at 737.

**35.** The trial court instructed the jury in part as follows:

There are four essential elements which the plaintiff must prove by a preponderance of the evidence in order to establish its claim under the Sherman Act, that is this provision of the antitrust law as follows: First, that there was a combination or a conspiracy between the defendant, Florida Rock Industries, and the Basic Asphalt Company to put the plaintiff out of the business. And that would be complied with if that occurred even though Basic Asphalt was nonwilling or a reluctant party to that particular agreement. But unless the plaintiff proves that, it cannot recover. Next, it must prove that such a combination or conspiracy constituted an unreasonable restraint on interstate commerce as hereafter defined.

. . . . .

The second element which plaintiff must prove to establish his claim is that the alleged threatened activity amounted to an unreasonable restraintive [sic] trade. Not all restraints of trade are unreasonable. All busi-

ness agreements restrain trade in some way. But only unreasonable restraints are illegal.

. . . . .

In sum and substance, I would suggest that you consider these questions. First, was the plaintiff, that is CAT, forced out of business because it lost the Basic Asphalt Company account? Now, if your answer to this question is no, you would cease your deliberations and promptly give a verdict for the defendant.

Now, if your answer to that question is yes, then did Basic Asphalt terminate the plaintiff because Florida Rock Industries threatened to cut off Basic Asphalt's allocation of aggregate unless it terminated the plaintiff? If your answer to this question is no, again you would cease your deliberations and return a verdict for the defendant.

If your answer is yes, then did the fact that the plaintiff was forced out of business have. a not insubstantial adverse affect upon interstate commerce by lessening competition or any other way? Now, if your answer to this is no, then again you must cease your deliberations and return a verdict for the defendant.

Record Excerpts at 26–36. Later, the trial court was asked to repeat a portion of its charge:

The Court: All right. First, was the plaintiff, Construction Aggregate Transport, Inc.—is that the correct name?

Mr. Schwartz: Yes sir.

The Court: Forced out of business because it lost the Basic Asphalt Company Account? Next, did Basic Asphalt terminate the plaintiff because Florida Rock Industries threatened to cut off Basic Asphalt's allocation of aggregate unless it terminated the plaintiff? Now, if you answer either of those questions no, that would be the end of the case.

Record Excerpts at 43. The trial court's instructions could have been clearer regarding the particular analysis (per se or rule of reason) being applied. Because the plaintiff did not introduce evidence of the relevant market, the case must be considered submitted under a per se theory. Neither party has argued or assumed otherwise.

ster Butane, Inc. v. Stewart Co., 651 F.2d 292, 295 (5th Cir.1981) (under rule of reason plaintiff must demonstrate anticompetitive effect in relevant market). Rather, the finding by the jury that FRI conspired with Basic to terminate CAT's services would suffice to support a verdict against FRI.[36]

FRI, on the other hand, submits that this case involves, at most, either an exclusive dealing arrangement between Basic and FRI or a requirements contract whereby Basic agreed to purchase all of its rock supplies from FRI. Incidental to such an agreement would be the termination of CAT's services as a transporter of rock from Rinker's competing mines in the Miami area. Under either of these theories a rule of reason instruction would have been required.

Since Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Sherman Act prohibition against "every" agreement in restraint of trade has been interpreted by the federal courts to forbid only "unreasonable restraints." Id. at 59–60, 31 S.Ct. at 515; see United States v. Realty Multi-List, Inc., 629 F.2d 1351, 1362 (5th Cir.1980). However, in Standard Oil as well as subsequent cases the Supreme Court has declared some restraints "inherently unreasonable" or "per se unlawful." Thus:

> there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); See Continental TV v. GTE Sylvania, Inc., 433 U.S. 36, 50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The Supreme Court has stressed, however, that "per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." 433 U.S. at 49–50, 97 S.Ct. at 2557.

To date, the rule of per se illegality has been applied to the following types of competitive restraints: horizontal and vertical price fixing agreements, see United States v. Socony Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); horizontal division of markets between competitors, see Timkin Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); tying arrangements, see Northern Pacific Ry. Co. v. United States, supra; and concerted refusals to deal or group boycotts. See Fashion Originators Guild of America v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). Proof of the foregoing types of restraints results in automatic condemnation solely because of the obvious restrictive effects on competition. CAT contends that the restraint involved in the case before this court falls within that category of restraints referred to as concerted refusals to deal or group boycotts.[37]

 It is well established that a merchant, whether he be a manufacturer, distributor, wholesaler, or retailer, may choose with whom he will do business and with whom he will not do business; such action generally does not violate the antitrust laws. Thus, the manufacturer can deal or not deal with customers "for reasons sufficient to itself." Eastern States Retail Lumber Dealers' Ass'n v. United States, 234

---

**36.** For general discussions of rule of reason analysis, see National Soc'y of Professional Eng'rs v. United States, 435 U.S. 679, 687–92, 98 S.Ct. 1355, 1363–65, 55 L.Ed.2d 637 (1978); P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues (Federal Judicial Center 1981). For a discussion of the historical development of both per se and rule of reason analysis, see I E. Kintner, supra note 31, §§ 8.2, 8.3, at 350–70.

**37.** These two terms are commonly used interchangeably. See St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 540–45, 98 S.Ct. 2923, 2929–31, 57 L.Ed.2d 932 (1978); United States v. Realty Multi-List, Inc., 629 F.2d 1351, 1354 (5th Cir.1980); Bauer, Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination, 79 Colum.L.Rev. 685, 685 n. 5 (1979).

U.S. 600, 614, 34 S.Ct. 951, 955, 58 L.Ed. 1490 (1914); *Universal Brands, Inc. v. Philip Morris, Inc.,* 546 F.2d 30, 33 (5th Cir. 1977). This sort of arrangement, referred to as "exclusive dealing," does not give rise to antitrust liability without proof of actual competitive injury. Implicit in the freedom to deal exclusively with one merchant, of course, is the freedom to refuse to deal with a competitor of that merchant. Again, such a unilateral exercise of business judgment is free from scrutiny in the absence of proof of competitive harm, or other underlying illegal behavior. *See Packard Motor Car Co. v. Webster Motor Car Co.,* 243 F.2d 418, 420 (D.C.Cir.), *cert. denied,* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957). When the merchant goes beyond this unilateral choice, however, and combines with other merchants to deal or not to deal only with a specific customer, the legal consequences are vastly different. Such an agreement between independent merchants is known as a "concerted refusal to deal" and is generally subject to the per se rule of illegality. *See Radiant Burners v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (per curiam); *Klor's v. Broadway-Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators Guild v. FTC, supra.*

CAT contends that this is precisely the type of agreement which was entered into between FRI, the rock supplier, and Basic, the purchaser of the rock. By conspiring not to utilize the services of CAT in hauling aggregate material, FRI and Basic would thus be guilty of a boycott of, or concerted refusal to deal with CAT.

Neither party has been able to bring to our attention a case involving the somewhat unique relationships between supplier, customer and transporter which are present in this case. Nonetheless, in our view the agreement here does not sufficiently resemble those arrangements which have been considered to be illegal per se in other cases. First, it is important to remember that a concerted refusal to deal essentially is an agreement among two or more parties that each will engage in an individual refusal to deal with a particular customer or customers. In the case before us, however, we have only one business entity refusing to deal with the plaintiff: the ultimate customer of FRI's rock, Basic Asphalt. That FRI may have instigated Basic's refusal to deal does not create the plurality of "refusals" necessary for the arrangement to be called a group boycott. *Compare Radiant Burners v. Peoples Gas Light & Coke Co.,* 364 U.S. at 659–60, 81 S.Ct. at 367 (refusal by association comprised of gas companies and gas burner manufacturers to sell gas to purchasers of plaintiff manufacturer's gas burner was illegal per se as a group boycott); *Klor's, Inc. v. Broadway-Hale Stores,* 359 U.S. at 212–13, 79 S.Ct. at 709–10 (agreement by manufacturers to sell only to defendant department store and not plaintiff's department store constituted group boycott); *Fashion Originators Guild v. FTC,* 312 U.S. at 465–66, 61 S.Ct. at 706 (refusal by manufacturers of textiles and original design dresses to sell to retailers purchasing "copycat" designs from competing manufacturers constituted illegal group boycott); *with Abadir & Co. v. First Mississippi Corp.,* 651 F.2d 422, 426–28 (5th Cir.1981) (manufacturer's agreement with one dealer not to sell to other dealer did not constitute group boycott); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1004–07 (5th Cir.) (conspiracy between manufacturer and distributor not to deal with plaintiff distributor did not constitute group boycott), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981); *Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111, 113 (5th Cir. 1979); *H. & B. Equipment Co. v. International Harvester,* 577 F.2d 239, 245–46 (5th Cir.1978); *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131–32 (2d Cir.) (en banc) (manufacturer's termination of plaintiff-dealer at behest of competing dealer was not a group boycott), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *Universal Brands, Inc. v. Philip Morris, Inc.,* 546 F.2d at 33–34 (no per se violation for manufacturer or supplier to agree with distributor to give him exclusive franchise unless part of an illegal boycott); *Packard*

Motor Car Co. v. Webster Motor Car Co., 243 F.2d at 420–21 (manufacturer's termination of small dealers at request of large dealer was exclusive dealing arrangement and not illegal per se). Thus, the touchstone of an illegal group boycott or concerted refusal to deal is the agreement between two or more merchants not to deal with another merchant when, in the absence of such an agreement, the conspiring merchants would normally have been free to deal with that merchant.

In the instant case, FRI does not itself arrange for or hire businesses to transport rock from its mines to its customers. Therefore, regardless of whether CAT's termination was the result of an agreement between FRI and Basic, there exists only one refusal to deal: that between Basic and CAT. The foregoing analysis of the alleged arrangement thus suggests that it is much closer to a unilateral refusal to deal. If so, then CAT's allegation of conspiracy between FRI and Basic would be subject to rule of reason analysis. *See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Standard Oil Co. v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

Aside from whether the agreement between FRI and Basic fits into the classic group boycott arrangement, however, the case law surrounding restraints on trade provides an alternative type of analysis. This analysis distinguishes between restraints which are horizontal in nature and those which may be considered vertical in nature. *See generally Continental TV v. GTE Sylvania,* 433 U.S. at 54–59, 97 S.Ct. at 2559–2562.[38] Horizontal combinations are cartels or agreements *among competitors.* Such agreements generally restrain competition among enterprises at the same level of distribution. Vertical restraints, on the other hand, are generally agreements between persons or firms occupying different levels in the chain of distribution of a specific product. *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d at 295.[39] As such, the effect of a purely vertical restraint will be to restrain competition at a level other than that from whence the restraint was initiated.[40] The classic example of a per se violation is an agreement between:

Competitors at the same level of the market structure to allocate territories in order to minimize competition. Such con-

**38.** For a valuable critique of the relationship between these alternative analyses of concerted refusals to deal, see generally Bauer, *supra* note 37.

**39.** Professor, now Judge, Bork has stated that:
A restraint—whether on price, territory, or any other item—is vertical ... when a firm operating at one level of an industry places restraints upon rivalry at another level for its own benefit.
R. Bork, The Antitrust Paradox 288 (1978); *see* Bauer, *supra* note 37, at 692 & n. 45.
If we examine the restraints alleged by CAT in terms of the underlying agreement (as we must given the plaintiff's allegation of conspiracy), then we see that the agreement is between entities occupying different levels—rock supplier and purchaser of rock. Likewise, the agreement which FRI initiated, and in which Basic acquiesced, *restrains* competition at a level different from that occupied by FRI. The primary restraint is upon competition among transporters of aggregate. Although this may redound to the benefit of FRI's trucking subsidiary, the restraint was *initiated* by FRI. Arguably, the restraint may endanger competition among purchasers of rock. This too however,

constitutes a different level in the chain of production. We see, then, that in this case the arrangement is almost purely vertical; the agreement is between, and the restraint acts upon, entities at different levels in the market. In contrast, a horizontal arrangement involves agreement among entities operating at the same level. Such an agreement generally will restrain competition *at that level* of the market. Finally, on occasion entities on the same market level will seek to have an entity at a different level impose restrictions upon them. Such putative vertical arrangements are in reality horizontal: the actual agreement is among competitors, and the effect is to restrain competition at their level, although the vehicle for the restraint occupies a different level. *See United States v. Topco Associates,* 405 U.S. 596, 608–09, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972); *Sports Center, Inc. v. Riddell, Inc.,* 673 F.2d 786, 791 n. 4 (5th Cir.1982).

**40.** As the Supreme Court made clear in the *Sylvania* case, a restraint on trade at a level different than that of the "initiator" of the agreement is often tolerated because it may lead to greater competition at that "initiating" level. *See infra* note 48.

certed action is usually termed a "horizontal" restraint, in contradistinction to *combinations of persons at different levels* of the market structure, *e.g.*, manufacturers and distributors, which are termed "vertical" restraints.

*United States v. Topco Associates,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) (emphasis added).

CAT contends that the restraint involved in this case is horizontal rather than vertical in nature. Specifically, it argues that the "horizontal aspect" necessary to bring this case within the rule of per se illegality is provided by FRI's aggregate hauling subsidiary, Tank Lines, which competes at the same market level as CAT. According to this argument, it is irrelevant that the parties to the alleged conspiracy are arranged in a completely vertical configuration so long as FRI competes with CAT through its trucking subsidiary. In our view, this argument is without merit.[41]

■ The case law demonstrates that there are several types of arrangements which may be characterized as horizontal, thus warranting the per se prohibition. First is the arrangement in which two or more businesses all operating at the same level in the chain of distribution agree to do business with one customer to the exclusion of a competitor of that customer. *See Klor's, Inc. v. Broadway-Hale Stores,* 359 U.S. at 207–10, 79 S.Ct. at 705–08. It is not necessary for the target of the boycott to operate at the same market level as the conspirators; the danger lies in allowing an entire industry, as opposed to an individual merchant in that industry, to restrict the sale of its goods thereby potentially restricting output at the cost of increased prices to the consumers.[42] *See also Com-Tel, Inc. v. DuKane Corp.,* 669 F.2d 404 (6th Cir.1982).

■ Another type of horizontal arrangement prohibited outright by the Sherman Act is that in which two or more merchants agree to sell their goods to a customer conditioned upon that customer's refusal to purchase goods manufactured by a competitor of the merchants. *See Fashion Originators Guild v. FTC,* 312 U.S. at 461–63, 61 S.Ct. at 705–06. In this situation, both the parties to the agreement and the target of the agreement occupy the same relative level in the chain of distribution. Again, such a restraint on trade directly implicates concerns for an industry's ability to restrict output by reducing the number of competitors.

■ Finally, the ban on horizontal restraints encompasses purportedly vertical arrangements which are actually horizontal agreements in disguise. *See United States v. Topco Associates,* 405 U.S. at 608–12, 92 S.Ct. at 1133–35. In such situations, businesses at the same market level, most often distributors, seek to have restraints imposed upon them by their supplier or manufacturer. The actual goal of such an arrangement, however, may be to organize *among themselves* how the distributors will carry

---

**41.** Implicit in the argument is treatment of Tank Lines, not a party to this litigation, as a co-conspirator of Basic and FRI. This assumption apparently stems from the relationship between Tank Lines and FRI. There is no evidence that officials of Tank Lines were involved in or had knowledge of the alleged conspiracy.

**42.** In *Klor's,* ten manufacturers conspired, at the behest of a competitor of Klor's, either not to sell goods to Klor's or to sell only at higher prices. The Supreme Court focused generally on the possible injury to retailers in Klor's position. *See* 359 U.S. at 210–13, 79 S.Ct. at 708–10. However, the Court also stressed that the agreement deprived "manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to [Klor's competitor]." The Court also contrasted the case with one where a dealer agrees to an exclusive distributorship. *Id.* at 212–13, 79 S.Ct. at 709–10. The necessary implication is that the feature which renders one agreement horizontal and the other vertical is the mutual agreement between entities on the same market level. *See Gough v. Rossmoor Corp.,* 585 F.2d 381, 387 n. 7 (9th Cir.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); McCormick, *Group Boycotts—Per Se or Not Per Se, That is the Question,* 7 Seton Hall L.Rev. 703, 760 (1976) (*Klor's* case is complex because it involved both horizontal and vertical restraints).

on their respective operations.[43] Such an agreement represents one of the most dangerous threats to competition, since it can have few purposes other than requiring the manufacturer to restrict output. *See* R. Bork, *The Antitrust Paradox* 389 (1978) (retailers who agree to horizontal restraint not desired by manufacturer are almost certainly attempting to restrict output for sake of monopoly gains). *See generally* L. Sullivan, Antitrust § 83 (1977) (discussing various types of boycotts).

 The foregoing examples of horizontal activity condemned by the antitrust laws all have one feature in common: they involve agreements between more than one entity at the same level of the market. The key to per se illegality in such cases, therefore, is not the relationship of the target to the members of the conspiracy.[44] Conversely, that one of the conspirators may operate as a direct competitor of the plaintiff is not dispositive. *See Oreck Corp. v. Whirlpool Corp.*, 579 F.2d at 131 (Whirlpool, manufacturer, at instigation of Sears, retailer, terminated its sales of vacuum cleaners to Oreck, who functioned at the same level as Sears). In fact, if it were true that participation in the conspiracy by an entity which operates on the plaintiff's market level

were sufficient to establish that horizontal aspect necessary for per se illegality, then the category of horizontal restraints would completely swallow the category of vertical restraints. For example, every exclusive dealing agreement between manufacturer and customer, though vertical as between its members, necessarily involves the exclusion of an entity which operates on the same market level as either the customer or the manufacturer. To declare that such an arrangement is therefore horizontal in nature would convert all restrictions such as vertical territorial agreements into per se violations. Such a result is directly contrary to the holding in the *Sylvania* case. *See* 433 U.S. at 58–59, 97 S.Ct. at 2561–2562.

CAT argues that the cases involving manufacturer-distributor chains should not control. While these arrangements are slightly different from the one involved here, such differences should not lead us to embark on a completely novel analysis of horizontal restraints.[45] In our view, the finding of an absence of a horizontal aspect in this case is well supported by precedent. *See, e.g., Abadir & Co. v. First Mississippi Corp.*, 651 F.2d at 424–26;[46] *Red Diamond*

---

**43.** Thus, in *Topco* the putative vertical restraint was actually a mutual, and thus horizontal restraint among competing distributors regarding the allocation of territory. 405 U.S. at 608–10, 92 S.Ct. at 1133–34. For one court's analysis of a similar situation, see *Sports Center, Inc. v. Riddell, Inc., supra* note 39.

**44.** One commentator has stated:

The danger to the market begins with aggregates of units at the same level. Any horizontal combination of sellers [which attempts to exclude a business from access to the market] ... would seem to be per se illegal, regardless whether the coercive pressure is directed at the victim or the victim's customers; so long as two or more defendants are on the same level of distribution, it would not seem to make any difference whether the party denied access to the market by the combination's refusal to deal is (1) on a different level from one or more members of the combination, or (2) is or is not a competitor.

Woolley, *Is a Boycott a Per Se Violation of the Antitrust Laws?* 27 Rutgers L.Rev. 773, 793

(1974) (footnotes omitted). Professor Gerhart points out that "[a]ttempts to synthesize the group boycott cases are legion." Gerhart, *The Supreme Court and Antitrust Analysis: The (Near) Triumph of the Chicago School,* 1982 Sup.Ct.Rev. 319, 324 n. 16 (1983).

**45.** One example of a classic refusal to deal, a vertical restraint, involves a purchaser refusing to buy from a seller. In the instant case, Basic is the purchaser of trucking services, and has refused to buy from CAT. When the purchaser refuses to buy because he is obligated to purchase from *another* source, the arrangement becomes one of *exclusive* dealing. The uniqueness of this case stems from the involvement of two products—rock and transportation. The potential significance of this aspect is discussed below.

**46.** In *Abadir,* the plaintiff, Abadir & Co., was an independent trader dealing in various chemicals, including urea—an inorganic chemical compound used worldwide for fertilizer and other industrial uses. The defendant, First Mississippi Corp., was engaged in the distribution and sale of urea. The defendant agreed to

*Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d at 1004–07 (conspiracy between manufacturer and distributor to exclude plaintiff-distributor not a horizontal agreement merely because manufacturer also conducts limited operations at plaintiff's level of the market); *Daniels v. All Steel Equipment, Inc.,* 590 F.2d at 113 (conspiracy between manufacturer and dealer to eliminate plaintiff-dealer does not constitute horizontal boycott); *H. & B. Equipment Co. v. International Harvester,* 577 F.2d at 245–46 (conspiracy between manufacturer and distributor horizontal only when source of conspiracy is combination of distributors).

In contending for a rule of per se illegality, both CAT and the district court relied on the former Fifth Circuit's decision in *E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178 (5th Cir.1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). In *McQuade,* a group of airlines published a consolidated listing of available tour programs in the Caribbean. On at least two occasions the airlines, through their tour manual committee, refused to list the plaintiff's tours in their programs and instead listed tours by a competitor. Although the court refused to apply a rule of per se illegality on the facts before it, the opinion contains dicta which tend to support CAT's

argument. First, the court cited *Klors* as a case "involving vertical combinations among traders at different marketing levels, designed to exclude from the market direct competitors of some members of the combination." *Id.* at 186. Actually, however, the conspiracy or combination in *Klors* included both vertical and horizontal agreements. While one of the conspirators, Broadway-Hale, was a retailer, and thus vertical with respect to the other conspirators, the remaining conspirators were all suppliers and horizontal with respect to each other. Second, the court summarized the case law dealing with collective refusals to deal in a manner which suggests that the primary consideration is whether exclusionary or coercive conduct has occurred:

> In all of these cases, the touchstone of per se illegality has been the purpose and effect of the arrangement in question. Where exclusionary or coercive conduct has been present, the arrangements have been viewed as "naked restraints of trade," and have fallen victim to the per se rule.

*Id.* at 187. In our view, however, this dictum in *McQuade* does not survive the Supreme Court's decision in *Continental TV, Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). *Sylvania* makes it clear that the "touchstone" of per

---

sell a certain quantity of urea to the plaintiff, conditioned upon the plaintiff's agreement to resell urea for consumption only in Asia. Subsequently, the defendant discovered that Abadir had resold the urea for consumption in the United States. The defendant then terminated its contract with Abadir and sold directly to Abadir's American customer, effectively eliminating competition from Abadir. In Abadir's antitrust action against First Mississippi, the plaintiff alleged that the contract between it and the defendant was an illegal horizontal market-dividing agreement, since First Mississippi engaged in the distribution of urea in competition with its distributors, such as Abadir. A panel of the Former Fifth Circuit, however, held otherwise. In doing so, the court recognized that the requirement of a horizontal aspect is not satisfied by the mere fact that the initiator of the restraint engages in some degree of competition on the plaintiff's market level. Rather, the court recognized that in essence the original agreement between Abadir and First Mississippi was simply a vertical

agreement imposed by one merchant upon another occupying a different level in the market. 651 F.2d at 425. Thus, the court looked to the policies justifying the distinction between vertical and horizontal restraints, and tempered its analysis with those general considerations which militate against expansion of the per se categories:

> Departure from the rule of reason standard must be based upon demonstrable economic effect rather than—as in [*United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) ]—upon formalistic line drawing.... It is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act.... The usual assumption is that a per se rule would grow out of a history of rule of reason cases all arriving at the same verdict.... When the courts are uncertain of the competitive significance of a particular type of restraint they decline to apply the per se label.

651 F.2d at 428 (citations omitted).

se illegality is not the presence of exclusionary conduct in the particular case but rather is the market impact of the kind of restrictions in question. *See id.* at 50–59, 97 S.Ct. at 2557–2562.[47] "Departure from the rule of reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Id.* at 58–59, 97 S.Ct. at 2561–2562.[48]

CAT attempts to bolster its argument by citation to the Sixth Circuit's recent decision in *Com-Tel, Inc. v. DuKane Corp.,* *supra. Com-Tel* involved a boycott initiated by one distributor which pressured its manufacturer, which in turn enforced the boycott among other distributors. The plaintiff, a competing distributor which was thereby barred from purchasing products from either the manufacturer or the boycotting distributors, brought suit, alleging a concerted refusal to deal. The Sixth Circuit held that the boycott in question was horizontal in nature, thus warranting an instruction on per se illegality. The court declared that the acquiescence, or participation by other distributors in the plan not to sell goods to the plaintiff provided the horizontal aspect necessary for per se illegality. 669 F.2d at 412–14. Although the court

noted that some commentators had suggested that the presence of *one* conspirator, *i.e.,* the initiating distributor, at a level horizontal to the plaintiff would provide a sufficient horizontal aspect, the court expressed no opinion as to the validity of such a proposition. *See id.* at 412–13 & n. 16.

In our view, CAT reads *Com-Tel* too broadly. The defendant there had argued that more than one conspirator, or "numerosity," was required at *each market level* of the boycott. The court's lengthy discussion of the numerosity issue was therefore aimed only at showing that the existence of a boycott does not depend upon the specific market level at which the boycott occurs; so long as there exists an agreement *among competitors at some level,* there will be a sufficient horizontal aspect. Thus, the key inquiry when determining whether a particular arrangement is horizontal or vertical is not the presence of a conspirator on the plaintiff's market level ("horizontal" to the plaintiff) but whether the conspiratorial agreement is *between* entities which are *horizontally arranged* at some level in the market.[49]

**47.** In fact, *McQuade* has been cited as an example of an attempt to temper the harshness of the per se rule when there is a clear absence of anticompetitive effects, notwithstanding that the arrangement in question seems to constitute a classic boycott. *See* McCormick, *supra* note 42, at 744–46.

**48.** The court in *Sylvania* announced that the primary concern of the antitrust laws is the protection of interbrand competition, *occasionally at a cost to intrabrand competition.* 433 U.S. at 58–59, 97 S.Ct. at 2561–62. We note that many unilateral refusals to deal or exclusive dealing situations necessarily involve an effect on interbrand competition. The decision by a distributor to carry only a particular manufacturer's line of products, to the exclusion of another manufacturer's line, may reduce the ability of the excluded manufacturer to market his goods. Nonetheless, this is not the type of negative impact on interbrand competition against which the Supreme Court's analysis in *Sylvania* was aimed. Rather, the Court was concerned with those types of arrangements in which competitors agree *among themselves* to take certain courses of action. The distinction rests on an economic assumption that when a manufacturer or supplier restricts his business vis-a-vis his customers or distributors he is

attempting to compete more effectively against the manufacturers and suppliers of other brands. The result will be vigorous interbrand or industry-wide competition. *See id.* at 54–56, 97 S.Ct. at 2559–2560. On the other hand, the rule of per se illegality for horizontal agreements is based on another economic assumption—that when business entities which operate at the same market level reach an agreement as to the conduct of their businesses, there is a strong likelihood that the net effect will be to restrict the output of products in an entire industry, thereby *restraining* interbrand competition. Such restraints in turn thwart such goals as consumer welfare and the efficient allocation of resources:

> "[H]orizontal" agreements among competitors . . . threaten the achievement of antitrust goals by eliminating competition among the participants and thereby allowing them to enhance their collective profits to the detriment of consumers.

P. Areeda, *supra* note 36, at 16.

**49.** As the court in *Com-Tel* pointed out, the arrangement in *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), was condemned even though there was only one conspirator on the

We therefore conclude that the arrangement in question cannot be labeled a horizontal restraint of trade.[50] This result, however, does not necessarily dictate a rule of reason analysis. As the Supreme Court noted in *Sylvania,* particular types of vertical restrictions may nonetheless require per se prohibition. *See* 433 U.S. at 58, 97 S.Ct. at 2561. We agree with FRI that the arrangement here is much closer to a unilateral refusal to deal than it is to a horizontal boycott. However, if the evidence will sustain a finding that FRI's conduct falls under one of the categories of per se illegality set forth earlier in this opinion, we need not remand for a new trial.[51]

As discussed earlier, the conspiracy alleged is unique in that the evidence suggests it was aimed at two different targets. One target was FRI's competitor in rock production, Rinker. The other target was CAT's innovative transportation operation which made possible the sale of Rinker stone in the Orlando market. By coercing Basic to exclude CAT's trucking operation, FRI could restrict the importation of its competitor's stone. Similarly, by discouraging its customers from purchasing stone

---

boycotted level—the numerosity requirement was satisfied at the boycotting level. Conversely, in *United States v. General Motors,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), horizontal numerosity existed at the boycotted level, among the target's competing distributors, all of whom were parties to the boycotting agreement.

In *Blackburn v. Crum & Forster,* 611 F.2d 102 (5th Cir.), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2989, 64 L.Ed.2d 856 (1980), a panel of the former Fifth Circuit stated that the per se rule against concerted refusals to deal applies only when "the plaintiff, the excluded party, is on the same competitive level with one member of the conspiracy. In other words, in such cases it may be proper to infer anticompetitive motive and effect because the conspiracy has a horizontal aspect." *Id.* at 104. Because there was no evidence of agreement between the alleged conspirators in *Blackburn,* the foregoing statement was unnecessary to decide the case. Further, the court's opinion that a horizontal restraint necessarily involves one conspirator on the plaintiff's level is doubtful, at best. Of course, most concerted refusals to deal or boycotts will involve at least one conspirator on the target's level, since there generally will be at least one "beneficiary" at that level of the refusal by the boycotters to deal with the target. *See, e.g., Radiant Burners v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originator's Guild of America v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). That this factor is not necessary in order to find a horizontal restraint, however, is implicit in many of the Supreme Court cases which resulted from prosecutions by the United States. For example, in *United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), the Court struck down as per se illegal a scheme whereby competing manufacturers were licensed and allocated territories in which to sell bedding products under the Sealy name. In

determining whether the arrangement was vertical or horizontal, the Court focused on the relative market levels of the parties to the agreement, and *not* upon the particular level of the market which was being injured. *See also Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 595–96, 71 S.Ct. 971, 973 (1951) (territorial restrictions among manufacturers); *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d 894, 899 (5th Cir.) (per se violation for competitors at same level of market to allocate territories), *cert. denied,* 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973); *A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1306 (9th Cir.1981); *National Tire Wholesale, Inc. v. The Washington Post Co.,* 441 F.Supp. 81, 87 (D.D.C.1977) (horizontal restraint requires collaboration among competitors), *aff'd without opinion,* 595 F.2d 888 (D.C.Cir.1979).

**50.** CAT's final argument is that the use of coercion in bringing about the agreement is a per se violation regardless of whether the agreement is vertical or horizontal. We reject this contention. *See Associated Radio Service Co. v. Page Airways, Inc.,* 624 F.2d 1342 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981); *Northwest Power Products, Inc. v. Omark Industries,* 576 F.2d 83 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126 (2d Cir.) (en banc), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). "The use of unfair means resulting in the substitution of one competitor for another without more does not violate the antitrust laws." *Manufacturing Research Corp. v. Greenlee Tool Co.,* 693 F.2d 1037, 1043 (11th Cir.1982).

**51.** To reiterate, those categories include horizontal and vertical price fixing agreements, division of markets between competitors, tying arrangements, and group boycotts. We have already eliminated the last category. Additionally, there is no contention by CAT that FRI has engaged in any practices regarding prices.

from Rinker, FRI could restrict competition in the aggregate hauling industry, thus potentially benefiting its subsidiary, Tank Lines. In our view, the particular arrangement involved is quite similar to a tying arrangement: for purposes of this lawsuit, FRI's stone, upon which Basic was dependent, would be the tying product, while the tied product would be the transportation of this stone.[52]

▇▇▇▇ If we examine the policies behind the prohibition on tying agreements, we see that the arrangement in the instant case directly implicates those policies. The primary concern is the restriction of competition in the market for the tied product. See Kypta v. McDonalds Corp., 671 F.2d 1282, 1284 (11th Cir.), cert. denied, —— U.S. ——, 103 S.Ct. 127, 74 L.Ed.2d 109 (1982); Southern Concrete Co. v. United States Steel Corp., 535 F.2d at 316–17. Tying arrangements are thus discouraged because:

> They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time

court recognized, allowing franchisors to set quality requirements with regard to the purchase of certain products can actually enhance competition. Id. at 379–80. These special concerns, however, may be limited to franchise disputes. In the case before us, CAT clearly was foreclosed from doing business with Basic, compare id. at 378, and there appears to be no competition-enhancing justification for allowing FRI to restrict competition in the tied market. Instead, this case directly implicates those concerns over barriers to entry which justify per se treatment for tying arrangements.

Aside from the franchise problem, the facts of Northern Pacific are similar to those of Kentucky Fried Chicken. In Northern Pacific, the Railroad sold and leased land on condition that goods produced on the land would be shipped over its lines, provided that its rates were equal to those of competing carriers. 356 U.S. at 3, 78 S.Ct. at 517. Thus, the case did not involve an "absolute" tie of the second product. The Court's discussion of the cost loophole in this tie, however, suggests that every effort to use power in one market to influence competition in another should arouse Sherman Act concern. See id. at 11–12, 78 S.Ct. at 521 (even if tie subject to many exceptions, essential fact remains that agreements are binding obligations which deny defendant's competitors access to fenced-off market on same terms as defendant). See generally, Note, Tie Out—A Case for the Extension of Tying Theory, 35 Ohio S.L.J. 140 (1974).

Finally, it is possible that although FRI did not expressly require Basic to secure shipping services from Tank Lines, the effect of the coercion was to ensure that Tank Lines would be CAT's substitute. Even under Kentucky Fried Chicken such an effect would warrant per se treatment. See 549 F.2d at 377–78. The record is ambiguous on this point; it is clear that Tank Lines did haul rock to Basic, but it is not certain that it was the exclusive transporter of Basic's rock during the critical period after CAT's termination.

---

**52.** Actually, the tied product would be the agreement *not* to utilize CAT's services in the transportation of stone. *See Northern Pacific Ry. Co. v. United States,* 356 U.S. at 5–6, 78 S.Ct. at 518 (1958) (tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different product, or at least agrees that he will not purchase that product from any other supplier).

Thus, if Hallowell's version of FRI's "threat" is accurate, it does not constitute a classic tying arrangement: Basic was not required to purchase the tied product, aggregate transportation, from FRI, but was merely admonished not to purchase it from CAT. The distinction potentially *is of great significance.* In *Kentucky Fried Chicken v. Diversified Packaging,* 549 F.2d 368 (5th Cir.1977), a panel of the former Fifth Circuit stated that:

> [W]hen the victim of an alleged tie-in is not required to buy a single unit of the tied product from the tying party or from any source in which the tying party has an interest or on whose sales the tying party earns a commission, the arrangement simply does not constitute a tie.

*Id.* at 378–79. Thus, *Kentucky Fried Chicken* provides that to constitute a tie the arrangement must economically benefit the alleged perpetrator with regard to the tied product. That case, however, involved franchise restrictions: The franchisee of the defendant franchisor was required to purchase certain products from either the franchisor or one of a group of suppliers approved by the franchisor. The record demonstrated that no supplier who met the product specifications required by the franchisor had ever failed to gain approval. *Id.* at 380. Further, there was no evidence that the franchisor had coerced the franchisee into purchasing its supplies.

Franchising inevitably creates a tension between free competition and the need of the franchisor to maintain the quality and reputation of its trademark. In such situations, as the

buyers are forced to forgo their free choice between competing products. *Fortner Enterprises v. U.S. Steel Corp.*, 394 U.S. 495, 498–99, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969); *see International Salt Co. v. United States*, 332 U.S. 392, 396–98, 68 S.Ct. 12, 15–16, 92 L.Ed. 20 (1947); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 975–77 (5th Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). In the case at bar, FRI threatened to cut off its supply of rock to Basic unless Basic terminated the hauling services of CAT. Therefore, if CAT's allegations are true, FRI attempted to transfer its market power in the aggregate supplying industry over to the aggregate hauling industry. The effect of this transfer would be to erect a barrier against competition in the tied industry, *i.e.*, hauling; this barrier is prohibited by the Sherman Act.[53]

■ As noted earlier, tying arrangements are among those rare categories of cases subject to a rule of per se illegality. *See Kentucky Fried Chicken v. Diversified Packaging*, 549 F.2d 368, 374 (5th Cir.1977). On the other hand, the specific application of the per se rule in such cases is somewhat unique. Normally, automatic condemnation under the per se rule occurs merely upon a finding that the defendant engaged in the restrictive conduct alleged; proof of anticompetitive effect in a relevant market need not be demonstrated. Tying arrangements, however, are subject to a special qualification that the party enforcing the tying agreement must have "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545; *see Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d at 975; *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 47–49 (5th Cir.1976); *Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir.1974). As the Supreme Court pointed out in *Northern Pacific*, the economic power which must be demonstrated need not rise to the level of monopoly power or even dominant power in the market. *See* 356 U.S. at 11, 78 S.Ct. at 521. "Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from its uniqueness in its attributes." *Fortner Enterprises v. U.S. Steel Corp.*, 394 U.S. at 503, 89 S.Ct. at 1258. Thus, "the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." *Id.* at 504, 89 S.Ct. at 1259.

■ At trial, however, CAT pursued only the "concerted refusal to deal" theory of liability, and did not introduce evidence of FRI's ability to raise prices with respect to an appreciable number of its customers. As a result, the trial court did not instruct the jury as to the need to find that FRI possessed sufficient market power to restrain competition in the market for the tied product. *See Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d at 977–78 & n. 12 (example of per se instruction for tying arrangement); *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d at 49 (same). Thus,

---

**53.** Professors Kaysen and Turner have stated: A tie-in always operates to raise the barriers to entry in the market of the tied good to the level of those in the market for the tying good: the seller who would supply the one can do so only if he can also supply the other, since he must be able to displace the whole package which the tying seller offers. Developing a substitute for the tying product may be very difficult, if not impossible. Thus, tying tends to spread market power into markets where it would not otherwise exist: for example, few firms are prepared to supply machines like those of IBM, whereas many may be prepared to supply punch cards. C. Kaysen and D. Turner, Antitrust Policy 157 (1959). *But see* R. Bork, *supra* note 39, at 366–81. Professor, now Judge, Posner has suggested that the real evil of tie-ins is that they enable a monopolist of the tying product to generate greater monopoly profits by engaging in price discrimination. *See* R. Posner, Antitrust Law 171–84 (1976).

even if CAT was entitled to proceed under a theory of tying, a question we do not decide, the judgment for CAT must be reversed and the cause remanded to the district court for a new trial.[54]

## V. CAUSATION AND DAMAGES

■ Under § 4 of the Clayton Act, a private plaintiff who has demonstrated a violation of the Sherman Act also must prove "an injury to his business resulting from the defendant's wrongful actions, and some indication of the amount of the damage done." *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 694 (5th Cir.1975) (quoting *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 20 (5th Cir.1974), *cert. denied*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974)), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976); *see J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561–63, 101 S.Ct. 1923, 1926–27, 68 L.Ed.2d 442 (1981); *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 114–15 & n. 9, 89 S.Ct. 1562, 1571–72 & n. 9, 23 L.Ed.2d 129 (1969); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–65 (1946); *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 581 (5th Cir.) (on remand from 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981)), *cert. denied*, —— U.S. ——, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982). FRI's final contentions are that CAT failed to introduce sufficient probative evidence of the fact of injury, and that CAT's evidence with regard to the quantum of damages resulting from the alleged injury was insubstantial. Regarding the damages issue, FRI specifically objects to the reliance by plaintiff's expert on a "pro forma" prepared by Hallowell when testifying as to CAT's profitability. In our view, CAT did introduce "substantial evidence" that FRI's actions, assuming they violated the Sherman Act, resulted in cognizable injury to

CAT's business enterprise. *See Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 846–48 (5th Cir.), *cert. denied*, 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981). Further, we think that plaintiff introduced barely enough evidence as to damages to withstand a directed verdict. *See Boeing v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc). Because we remand for a new trial for other reasons, *see supra* Section IV, we need not determine whether appellants should have been granted a new trial solely on the damages issue. Moreover, given the complexity of this case, the possibility that the plaintiff at retrial will rely on new theories with regard to liability, and the deficiencies discussed below in CAT's evidence with respect to damages, we would in any event decline to exercise our discretion to order a new trial only as to liability.[55] We take the opportunity below, however, to express our concern over the apparent weaknesses in CAT's evidence with regard to damages. *See Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 999 (5th Cir.1976).

### A. Fact of Injury

■ Our first task is to determine whether there is a causal relation between the alleged antitrust violation and an injury to plaintiff's business. *Copper Liquor, Inc. v. Adolph Coors Co.*, 509 F.2d 758, 759 (5th Cir.) (per curiam), *denying petition for rehearing*, 506 F.2d 934 (5th Cir.1975). The plaintiff must introduce substantial probative facts demonstrating that some damage flowed from the unlawful conspiracy. *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. at 123–25, 89 S.Ct. at 1576–77; *Jot-Em-Down Store (JEDS), Inc. v. Cotter & Co.*, 651 F.2d 245, 247 (5th Cir.1981) (causation must be proved by sufficient evidence); *Malcolm v. Marathon Oil Co.*, 642 F.2d at

---

**54.** *See Doran v. Petroleum Management Corp.*, 576 F.2d 91, 93 (5th Cir.1978) (parties free on remand to present by amendment new issues not inconsistent with appellate decision) (*quoting Jones v. St. Paul Fire & Marine Co.*, 108 F.2d 123, 124 (5th Cir.1939)). *See also GTE Sylvania, Inc. v. Continental T.V., Inc.*, 537 F.2d 980, 1004 n. 41 (9th Cir.1976) (en banc) (re-

manding for new trial under rule of reason where trial court erred in applying per se theory of illegality), *aff'd*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

**55.** *See generally Williams v. Slade*, 431 F.2d 605, 608–09 (5th Cir.1970).

848 (requiring evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions); *Shumate & Co. v. National Ass'n of Securities Dealers, Inc.,* 509 F.2d 147, 152–53 (5th Cir.) (incumbent upon plaintiff to produce some credible evidence to support allegations of injury), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975). On the other hand, "it is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4." *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9; *see Foremost-McKesson v. Instrumentation Laboratory,* 527 F.2d 417, 420 (5th Cir.1976) (plaintiff must present substantial evidence that illegal practices by defendant were material cause of plaintiff's injuries); *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d at 20 (where damages may have been caused by number of factors plaintiff need not prove defendant's actions were sole proximate cause; plaintiff must only show with fair degree of certainty that defendant's conduct materially contributed to injury).

FRI advances three arguments to demonstrate that CAT was not injured by its alleged anticompetitive acts. First, FRI contends that Basic's limited purchases of stone subsequent to its termination of CAT demonstrate that Basic soon would have terminated CAT without any prodding by FRI.

According to Hallowell, he and Scott Carlson of Basic had an understanding whereby CAT would deliver 5,000 tons of Miami rock to Basic. At CAT's current rate of delivery, this would have generated approximately two to two and one-half months of hauling. Hallowell believed that this length of time with a 24-hour customer would allow CAT to establish itself on a firm footing. Hallowell also testified that at the time he met with Carlson he was accompanied by one of his drivers, Charles Justice. Justice corroborated this testimony, and also testified as to the 5,000-ton agreement between Hallowell and Carlson. Carlson, on the other hand, denied the existence of an agreement involving 5,000 tons, and could not recall the presence of anyone other than Hallowell during their negotiations. This testimony, however, is undercut by the testimony of one of Basic's own employees, Robert Peters, who stated that Hallowell *had* been accompanied by another man.

FRI contends that the evidence at trial refutes CAT's claim of an understanding to deliver 5,000 tons to Basic. From the time that CAT was terminated until the end of 1979, a period of approximately three months, Basic received a total of only eight shipments of rock, totaling approximately 200 tons; all were delivered the last three days of November, and all were purchased from FRI. Thus, FRI argues that even though CAT was forced to use Rinker South Orange, a non 24-hour customer, as its northern terminus, this changeover resulted in greater revenues for CAT than it would have earned had it not been terminated by Basic.

The record, however, establishes that during the relevant time period rock produced in the Brooksville-Orlando market was in short supply.[56] CAT's introduction of Miami rock into the Brooksville-Orlando market was the only alternative to rock produced in that market. Moreover, it was uncon-

---

56. There was some dispute at trial as to whether FRI's rock was "on allocation." Apparently, during the early 1970's FRI had attempted to cope with chronic shortages of rock by allocating a specific percentage to each of its customers. According to employees of FRI, this practice was abandoned shortly thereafter due to complaints by its customers. At trial, Hallowell and other CAT employees all claimed that during the time period here involved FRI was again allocating rock on some type of percentage basis among its customers. Employees of FRI denied this. In our view, whether or not FRI was in fact pursuing such a course of conduct is a relatively minor issue. All parties seem to have agreed that the demand for Orlando rock exceeded its current supply. *See also supra* note 26 (statement by employee of FRI regarding "stockpile conditions").

troverted at trial that Basic had a continual debt problem with FRI;. Basic's debt at the time of the events in question was variously estimated at from $90,000 to $150,000.

Our examination of the record persuades us that there is a sufficient basis for rejecting FRI's contention. As discussed above, Carlson's recollection of the events surrounding the hiring of CAT was contradicted in at least one significant regard by the testimony of a fellow employee.[57] Further, the evidence of rock shortages in the Brooksville-Orlando market, combined with Basic's position as a substantial debtor of FRI, could lead a reasonable juror to conclude that Basic's subsequent course of dealing with FRI is not indicative of how it would have behaved had it continued to enjoy a steady supply of cheaper rock from the Miami area. *See Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d at 1362.

■ FRI next argues that even if CAT had not been terminated by Basic it soon would have been terminated at the south end of its circuit by its sand customer, Rinker. According to John Dicks, Rinker's Regions Operations Manager, Rinker did not anticipate a long-term relation with CAT, and Hallowell had been aware of this. Dicks stated that Rinker normally purchased its sand directly from the Miami market. In his view, Miami sand was a better grade than that produced in the Clermont area. He further testified that Rinker's reason for bringing in Orlando sand was a temporary shortage in the Miami supply. Thus, as soon as it would be able

to, Rinker intended to switch back over to the Miami supply.[58] The evidence is clear, however, that until CAT collapsed it was still transporting sand south to Rinker's West Palm Beach plant and was still transporting rock north from Rinker Miami to Rinker South Orange. Finally, FRI's argument as to the probability that CAT would have been terminated by Rinker may well be relevant to the quantum of damages for which FRI is liable. It does not, however, have any bearing on the loss of revenue CAT may have suffered during the remaining two months of its operations, during which time Rinker remained its customer. Thus, this argument by FRI has no bearing on the fact of injury issue.

■ Finally, FRI contends that CAT did not discharge its obligation to mitigate damages. *See Golf City, Inc. v. Wilson Sporting Goods, Inc.*, 555 F.2d 426, 436 (5th Cir.1977); *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 46–47 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972). In our view, this contention is without merit. Immediately after its termination by Basic, CAT secured as a customer for Miami stone the Rinker South Orange plant. CAT continued with Rinker as a customer until it ceased operations. FRI contends, however, that since CAT's viability depended upon securing a 24-hour customer, CAT's relationship with Rinker, a limited delivery time customer, was an insufficient effort to mitigate. According to testimony by one of Hallowell's employees, however, CAT had exhausted the available 24-hour customers. *See* Record at 1499. The record simply does not demonstrate

---

**57.** Moreover, soon after CAT began hauling stone to Basic, Basic established an apparently open-ended line of credit with Rinker Miami.

**58.** There was also evidence that at approximately the same time that CAT went out of business, Rinker opened up a rail spur from its Miami stone mines to its plant at City Point, fifty miles south of Orlando. According to Dicks, this spur allowed Rinker itself to ship its Miami rock to City Point by train, and from there by truck into the Orlando market. At the time of trial, Rinker was shipping approximately 30 cars a day; it had the capacity to ship more. It is not clear what relevance this evidence has to the case at hand. There is no

evidence to suggest that Rinker was doing any more than shipping its own rock from Miami to its own asphalt plants in the Orlando area; in other words, Rinker's ability to satisfy its own rock needs in the Orlando area does not necessarily bear upon the demand of producers such as Basic for Miami rock. Moreover, Dicks himself conceded that if CAT had been able to stay in business long enough to reach its anticipated goal of hauling 1,000 tons a day at a competitive price Rinker South Orange may have agreed to stay open on a 24-hour basis in order to continue doing business with CAT. *See* Record at 1075–81.

that CAT's inability to secure a 24-hour customer was the result of its own "business calculus." *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. at 128, 89 S.Ct. at 1579.

We thus conclude that the record does not demonstrate that "complete absence of substantial probative facts" necessary to allow us to overturn the jury's determination of causation. *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d 894, 902 (5th Cir.), *cert. denied,* 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973); *see Copper Liquor, Inc. v. Adolph Coors Co.,* 506 F.2d 934, 953 (5th Cir.), *rehearing denied,* 509 F.2d 758 (5th Cir.1975) (per curiam). The unrebutted testimony by Hallowell, Justice, and FRI's former vice-president, Jerry De-Garmo, established that CAT's viability depended upon securing and maintaining the 24-hour customer at the north terminus of its haul.[59] Moreover, CAT's invoices demonstrate that the last week it shipped stone to Basic Asphalt its revenue was approximately $2,100. During that week a total of sixteen trailer-loads were delivered in a period of five days. By the beginning of November, CAT was delivering only two trailer-loads of stone per day to Rinker's non-24-hour plant at South Orange, and its revenue had dropped to approximately $1,300 per week. From this evidence, a juror could reasonably infer that FRI's action in coercing the termination of CAT by Basic was a material cause of *some* economic damage to CAT.[60]

## B. Amount of Damages

Once the fact of causation is established, the burden of proving damages is much less severe. *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d at 902; *see J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. at 566–67, 101 S.Ct. at 1929–30; *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. at 124, 89 S.Ct. at 1577; *Malcolm v. Marathon Oil Co.,* 642 F.2d at 858; *Household Goods Carriers' Bureau v. Terrell,* 452 F.2d at 159. This rule of leniency with regard to proof of damages is necessary because:

**59.** In *H & B Equipment Co. v. International Harvester,* 577 F.2d 239 (5th Cir.1978), a panel of the former Fifth Circuit stated that "isolated self-serving statements" of a plaintiff's corporate officers are insufficient to establish antitrust causation. In our view, *H & B Equipment* is distinguishable: There, statements by plaintiff's corporate officer provided the sole basis for an inference of causation. *Id.* at 247. Nor did the plaintiff present any expert testimony as to its ability to penetrate the market and maintain a viable market position. *Id.* In the case at bar, Hallowell's testimony was corroborated by a former officer of FRI. Further, it is uncontroverted that each one-way haul by CAT which resulted from its inability to secure a 24-hour customer at the northern terminus resulted in a loss of revenue for that haul.

**60.** The cases relied upon by FRI to demonstrate the absence of causation are readily distinguishable. For example, *Copper Liquor, Inc. v. Adolph Coors Co.,* 509 F.2d 758 (5th Cir.1975) (per curiam), *denying petition for rehearing,* 506 F.2d 934, involved a complaint by a beer retailer who operated at a substantial profit both before and after the alleged antitrust violation. According to the plaintiff, his supply of Coors beer had been cut off because he failed to abide by the defendant's pricing and quality restrictions. The plaintiff, however, used Coors only as a "loss leader" in order to draw customers into the store to purchase other goods. The court rejected his claim of injury and damages because the plaintiff presented no itemized product-by-product records to show the impact on the sale of other products resulting from his loss of Coors beer. Essentially, the only evidence introduced was the plaintiff's gross bank deposit records, which did not reflect product-by-product effects. More importantly, however, although the plaintiff had available to him daily sales records which would have been extremely probative, he made no attempt to introduce these records. The court concluded that when relative degrees of profitability are concerned, as opposed to the destruction of a going concern, there can be no evidentiary substitute for accurate sales and inventory records. Clearly, *Copper Liquor* does not govern the case before this court.

Similarly, in *Shumate & Co. v. National Ass'n of Securities Dealers, Inc.,* 509 F.2d 147 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975), plaintiff failed to produce any relevant data bearing upon injury and damages other than his own unsupported testimony. *See also Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690 (5th Cir.1975) (no injury from price fixing scheme where plaintiff conceded he would have voluntarily taken action which defendant sought to coerce, and where plaintiff failed to introduce any evidence of reduction in sales), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976).

[a]ny other rule would enable the wrong-doer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. [Thus] . . . the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.

*Bigelow v. RKO Radio Pictures,* 327 U.S. at 264–65, 66 S.Ct. at 580; *see Lehrman v. Gulf Oil Corp.,* 464 F.2d at 45. On the other hand, although the question of damages requires that the court "enter into the realm of the imprecise and the uncertain," we must reverse the jury's verdict if it becomes apparent that its judgment was based on speculation and guesswork. *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. at 124, 89 S.Ct. at 1577. Our task is to ensure that the jury rendered a just and reasonable estimate based on relevant data. *Id.*

FRI has argued vigorously that CAT's evidence with regard to the amount of damages is overly speculative and insufficient to support the verdict. In particular, FRI contends that testimony by plaintiff's expert, Dr. Frederick Raffa, as well as certain charts used by Dr. Raffa, were so deficient that they should have been held inadmissible. Our review of the record satisfies us that CAT's evidence of damages was barely sufficient to withstand a directed verdict.[61]

However, we have grave reservations regarding much of Dr. Raffa's testimony. Because we reverse and remand for a new trial on the basis of the erroneous per se instruction, in the interests of judicial economy we will discuss below our concerns about the evidence.

■ CAT's theory of damages was that had it been able to continue delivering to Basic it could have stabilized its costs and revenues to the point where it could have begun expanding its operation. Because FRI was the cause of its termination by Basic, then FRI is responsible for the loss of all future profits which could have been earned by CAT. Loss of future profits is a well-established basis for determining the measure of economic injury resulting from an anticompetitive act which forces the victim out of business. *See H & B Equipment Co. v. International Harvester,* 577 F.2d at 246–47; *Lehrman v. Gulf Oil Corp.,* 464 F.2d at 44–45; *Household Goods Carriers' Bureau v. Terrell,* 452 F.2d 152, 159–60 (5th Cir.1971) (en banc). Accordingly, the trial court instructed the jury on this theory of future profits.[62]

The precise manner in which the plaintiff arrived at a calculation for lost future profits was hotly disputed at trial. The plaintiff relied exclusively on the testimony of Dr. Raffa, who took as his starting point the pro forma prepared by Hallowell during the planning stages of CAT.[63] The first

**61.** In particular, CAT's receipts demonstrate a clear decrease in revenues subsequent to its termination by Basic at the behest of FRI. *See Malcolm v. Marathon Oil Co.,* 642 F.2d at 858–60 & n. 24 (when plaintiff has offered sufficient evidence of fact of damage directed verdict on *amount* of damages is proper only in most unusual circumstances).

**62.** The trial court stated in part:
The use of a projection of anticipated profits by an antitrust plaintiff in proving damages is entirely acceptable so long as the projection when reduced to present cash value leads to a reasonable estimate of the damages caused by the violation based upon the evidence.
Now, you may elect to use any formula or theory that you consider reasonable for a reasonable estimate or an approximation

provided that it is based upon the evidence in the case and the law as stated by the court. Now, in considering the elements of future profits and in determining what damages, if any, were sustained by the plaintiff, if it is entitled to recover, you are instructed that if because of the violation of the antitrust laws plaintiff was unable to earn that profit which it could have earned but for the violation of the antitrust laws, the plaintiff was, in fact, damaged . . .
Now, the fact that a plaintiff's business may have been new or unestablished is not fatal to the amount of damages constituting that profit.
Record at 1218.

**63.** This two-page pro forma was a statement of expected income and expenditures with regard to the planned operation of the new business. Record at 855. During CAT's existence the

page of the pro forma contained a breakdown of expected income from hauling both sand and stone; the income arrived at by Hallowell was 94.2 cents per running mile. The second page of the pro forma contained a breakdown of the estimated costs of operation, including driver's salaries, fuel, equipment payments, tires, insurance, repairs, licenses, bookkeeping and other overhead, phone bills, and turnpike tolls. Hallowell's pro forma arrived at an estimated cost of 75 cents per running mile, with an overall profit of 19.2 cents per running mile or 19.8 percent.

Using this pro forma as well as the actual revenues as reflected in CAT's invoices, Raffa established a historical revenue pattern. This revenue pattern included three specific historic periods: a start-up period during which CAT earned an average weekly revenue of approximately $1,600; a normalized period during which CAT earned an average weekly revenue of approximately $3,000 per week; and a slow down period beginning with CAT's termination by Southern Paving. Next, Raffa established a projection of the normalized period over time, using the base revenue of $3,000 per week. In order to establish a projection of CAT's *growth,* Raffa relied upon two statistical proxies. With regard to CAT's sand hauling, Raffa relied upon the growth rate in residential building permit activity in the West Palm Beach area—the area and industry in which CAT's sand would be utilized. As a proxy for CAT's rock hauling business, Raffa relied upon the Florida Department of State Transportation's historical data on asphalt road construction in the Central Florida area—the likely destination of rock hauled by CAT. Weighing the relevant growth rates on the basis of those percentages of CAT's business respectively devoted to sand and rock hauling,[64] Raffa arrived at

an estimated annual growth rate for CAT's business of 7.58%. Next, Raffa annualized the estimated weekly revenue of CAT during its normalized period. Multiplying this annualized revenue by the weighted growth rate, Raffa determined that CAT's revenue for 1980 had it continued in business would have been $169,240. This revenue would have increased over a 10-year period, until by 1989 it would have amounted to $303,638.

Next, Raffa computed expected annual costs. In doing so he relied exclusively upon the pro forma, as well as on interviews with Hallowell. He did not rely on actual costs as represented by cancelled checks. Based on the pro forma estimates he arrived at an annualized cost of $123,720; when subtracted from the revenue figure this yielded a projected net profit for 1980 of approximately $36,000. Over a ten-year period,[65] Raffa calculated that CAT's profits would have amounted to over $500,000. Reduced by an annual interest rate of 8% this amounted to a present value of approximately $355,000.

FRI's expert witness, Dr. Sanford Berg, used a similar methodology in that he relied upon the pro forma revenue estimates and calculated annualized figures based on the revenue during CAT's normalized period of operations. However, his sources differed in one significant respect: he did not rely upon the pro forma's *cost* estimates but chose instead to use cancelled business checks to reconstruct actual cash outlays during this period. According to Berg, he and an assistant reviewed each check drawn on CAT's bank account and attempted to place them into the cost categories used on the pro forma. It is not surprising that Dr. Berg arrived at a different conclusion as to CAT's profitability during the normalized

figures contained in the pro forma were never updated, despite changes in the costs of various items such as fuel.

64. The relevant growth rates were 10.48% for residential building, and 5.1% for road construction. Road hauling produced 57.7% of CAT's revenue, while sand hauling resulted in 43.3% of that revenue. Record at 863–66.

65. Dr. Raffa testified that he used a ten-year period because Department of Labor statistics indicated that Hallowell could reasonably be expected to continue working for that period of time. In addition, he relied upon Hallowell's own representations.

period. Whereas Dr. Raffa had estimated annual costs at approximately $123,000, Dr. Berg arrived at a figure of $175,000. This figure translated into an annual *loss* of over $18,000, or 11.7%. *See* Defendant's Exhibit 6.

This wide disparity in cost figures is partially explained by Dr. Berg's detailed itemization of the pro forma category listed as "bookkeeping, billing, overhead and supervision." According to the pro forma, the annual cost for these operations would have been $10,000. Dr. Berg broke this category down further, however, and arrived at a much larger figure—approximately $41,000. A good deal of this difference lies in Hallowell's admission that his own salary was included in this fund.[66] In addition to these expenses which were not reflected in the pro forma estimates, Dr. Berg's investigation turned up an additional $61,776 of debt for which CAT had not yet made payments.[67] Most of these expenses, such as withholding taxes, could be termed recurring expenses rather than start-up ex-penses, and hence would be incurred during any normalized period of operations.[68]

Dr. Raffa testified that for a business as young as CAT he would not expect records of actual cash outlays to be entirely accurate. In his judgment, use of the pro forma was a reasonable source for his calculations. Dr. Raffa admitted, however, that he had not been provided copies of the cancelled checks prior to making his study of CAT's operations. He further conceded that he would prefer, when possible, to be provided an actual experience of costs. Finally, although he had made some effort to supplement the pro forma with evidence of CAT's actual expenses, he admitted relying upon Hallowell's representations that CAT's actual expenses had been close to those estimates provided by the pro forma.[69]

The most problematic aspect of Dr. Raffa's reliance on the pro forma, however, was the mathematical conclusion contained in the document itself. In order to calculate revenue per running mile, Hallowell

66. Thus, although the estimated cost for items in this category was $10,000, Dr. Berg's calculation of checks actually made payable to Hallowell as salary amounted to almost $22,000. This did not include other items also included in this category, such as road expense ($6,500), car payments ($2,800), and miscellaneous expenses ($7,100).

67. For example, although according to CAT's disbursements for salary it had been withholding federal and state income taxes from its employees, it had never actually paid such taxes to the authorities. Thus, CAT had incurred tax liability of over $35,000. In addition, CAT had incurred a liability of over $7,000 with the Florida Department of Transportation for payment of highway tolls.

68. Implicit in the methodology used by both experts, the annualization of costs and revenues incurred during the normalized period of operation, was an effort to separate out recurring costs from start-up costs. Calculations based on the pro forma would facilitate this task, since each category could readily be assigned the label of either recurring or start-up costs. Dr. Berg testified that he encountered some difficulty in attempting to determine from the cancelled checks whether or not certain outlays belonged in one category or another. Dr. Berg further testified that occasionally he was not able to determine whether a particular expenditure was made during the normalized period as opposed to either the start-up period or the slow-down period. A case in point would be the downpayment on the trailers which CAT purchased. Because of manufacturing flaws in these trailers, which were returned several times to the manufacturer, CAT's deadline for the downpayment was delayed by several months. If the actual payment was made during the normalized period, the expense nonetheless should be considered a part of start-up expenses; including this expenditure during the normalized period would tend to skew Dr. Berg's calculation of annual expenses. On the other hand, since CAT intended to continue ordering sets of trailers at an increased rate, and not simply to operate on the first sets of trailers manufactured, it is possible that inclusion of this expense would actually result in a more accurate calculation.

69. In at least one category the pro forma clearly was inaccurate. Hallowell had based his fuel costs per mile upon an estimate that diesel fuel would cost 55 cents a gallon. Soon after CAT began operations, however, the price of fuel rose to approximately $1. At one point during his testimony, Dr. Raffa indicated he relied on the original figure of 55 cents. At another point, he seemed to suggest that he had updated the cost to 85 cents a gallon. Even this estimate, however, falls far short of the mark.

had used a figure of 548 miles, or one round trip, from Miami to Orlando and back. When calculating the *cost* per running mile, however, Hallowell had used a figure of 800 miles per round trip. Dr. Berg testified that use of the much larger figure when calculating costs would reduce considerably the calculation of cost per running mile. Dr. Raffa testified that he did not know why the differing mileage figures had been used. Various of CAT's witnesses, including Hallowell, were questioned at length as to use of the 800-mile figure; none of these witnesses provided a satisfactory explanation.[70]

Although we are mindful of the lesser standard of sufficiency which controls once the fact of causation has been established, an expert's projection of future profits must be supported by proven facts. *See Chrysler Credit Corp. v. J. Truett Payne Co.,* 670 F.2d at 582; *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d at 24. The available evidence, however, suggests that the estimates of profits contained in the pro forma were distorted and that CAT's actual experience with expenditures differed significantly from those estimates. Moreover, Dr. Raffa not only failed

to review available evidence of actual costs, but also failed to demonstrate why that evidence was not more accurate than the estimates upon which he relied.[71] At retrial, therefore, the trial court should reconsider its decision to admit Dr. Raffa's testimony based upon the pro forma, unless CAT sufficiently explains the apparent inconsistencies in its pro forma and its failure to consider the evidence of actual costs. *See Georgia Kaolin Int'l v. M/V Grand Justice,* 644 F.2d 412, 417 (5th Cir.1981) (judgment based on testimony by expert who relied on demonstrably incorrect statistics cannot stand; case remanded to district court for redetermination of issue); *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d at 998–1000 (where practical court should exclude particular assumptions or other aspects of expert testimony which considered individually do not meet minimum of probative value); *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 911–13 (2d Cir.) (expert testimony inadmissible where basic assumption as to market share plaintiff would have garnered is completely unsupported), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962).[72]

**70.** The thrust of Hallowell's explanation appears to be that although revenue was calculated on the basis of using one set of trailers during the first few months of CAT's operation, the costs were calculated upon the basis of the ideal utilization of CAT's resources at a time when it would have between 10 and 20 trailers on the road. Hallowell testified that maximum utilization would result when CAT would have sufficient equipment to run its tractors exclusively on the Florida Turnpike between the Palm Beach exit and the Orlando exit. At the same time, CAT would rely upon tractors stationed at these exits to actually conduct the shuttle operation of pulling each trailer to the various delivery and loading points. Apparently, the mileage between Turnpike exits would be approximately 800 miles per round trip, excluding the shuttle operations. Regardless of the viability of this plan, we agree with FRI that use of the two different mileage figures to calculate revenue per running mile results in a distortion of CAT's profit margin.

**71.** FRI cites *Copper Liquor, Inc. v. Adolph Coors Co.,* 506 F.2d 934 (5th Cir.), *aff'd on rehearing,* 509 F.2d 758 (5th Cir.1975) (per cu-

riam), for the proposition that testimony as to lost future profits must be based upon the best available evidence. We would not go so far, however. In *Copper Liquor* the plaintiff had established a long track record of profitability, and had available to it accurate sales and inventory records. In such a situation, reliance on general operating statements and income tax records clearly is insufficient. *Copper Liquor* does *not* control when, as here, the plaintiff enjoyed only a brief existence. *See Greene v. General Foods Corp.,* 517 F.2d 635, 665–66 & n. 23 (5th Cir.1975) (to support jury verdict expert's assumptions and methodology need not be most preferable ones), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976).

**72.** We note, in passing, that CAT seems to have proceeded under the assumption that in order to prove lost future profits it must demonstrate that the business destroyed was operating at a profit. Such is clearly not the law in this circuit. *See Terrell v. Household Goods Carriers' Bureau,* 494 F.2d at 24 (plaintiff may proceed under lost profits theory even if business had never been profitable so long as each element of projection is supported by proven facts).

**790**

## VI. CONCLUSION

On the basis of the foregoing discussion, the judgment is reversed and the cause is remanded to the district court for retrial under the correct rule of reason theory of liability[73] and for retrial on the issue of damages.

REVERSED and REMANDED.

---

*Accord, Murphy Tugboat Co. v. Crowley,* 658 F.2d 1256, 1260–63 (9th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982). Thus, plaintiff's case for damages does not necessarily depend upon showing CAT's profit-making ability during the normalized period of operations. When, however, the expert's opinion is *based* on the assumption that an entity was profitable, then the validity of the expert's ultimate opinion depends upon the accuracy of that assumption.

73. Should plaintiff choose to pursue a tying theory, and produce sufficient evidence to warrant same, a qualified "per se" instruction would be appropriate.